889 So.2d 1034 (2004)
STATE of Louisiana
v.
Brandon HALL.
No. 04-KA-253.
Court of Appeal of Louisiana, Fifth Circuit.
November 16, 2004.
John M. Crum, Jr., District Attorney, Rodney A. Brignac, Assistant District Attorney, Edgard, LA, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD and JAMES L. CANNELLA.
SOL GOTHARD, Judge.
Defendant, Brandon Hall, was charged with two counts of attempted second degree murder in violation of La. R.S. 14:30.1 and 14:27. Hall pled not guilty at arraignment.
Prior to trial defendant filed a motion in limine requesting that the court declare that the State, rather than the defendant, *1035 had the burden of proving beyond a reasonable doubt the justification defense in a non-homicide situation. Defendant's motion in limine was denied.
After trial on the merits, defendant was found guilty of aggravated battery on both counts. The trial court sentenced defendant to imprisonment at hard labor for five years on each count to run concurrently, and suspended two of the five years. The trial court stated that, upon release, defendant would be placed on three years of active probation. It also ordered defendant to pay a $5,000.00 fine.
Subsequently, the trial court granted a motion to reconsider sentence and vacated the sentence. The trial court sentenced defendant to imprisonment at hard labor for three years on each count to run concurrently. It stated that, because this was a crime of violence, defendant had to serve eighty-five percent of his sentence before he would be eligible for parole, and that probation was not possible. Defendant filed a motion for appeal that was granted.

FACTS
The State introduced evidence to show that, on May 19, 2002, during a graduation party at West St. John Elementary School, defendant shot Brian Lumar and Christopher Johnson with a gun. According to the State, defendant specifically intended to kill the victims. Defendant disputed this version and introduced evidence to show that he was trying to defend himself and his three friends.
According to Ms. DaShon Lumar, Brian Lumar's cousin, Mr. Lumar walked up to Ramond Taylor, Ms. Lumar's boyfriend, at the party. Taylor punched Mr. Lumar and the two men began fighting, which drew a big crowd. A group of Mr. Lumar's friends, maybe three or four other boys, subsequently jumped on Taylor and began beating him. Defendant then pulled out his gun, aimed it at Mr. Lumar, and started shooting. Ms. Lumar testified that defendant shot approximately four to seven times. Mr. Lumar began to run away; however, one of the bullets hit him and he fell to the ground.
Mr. Lumar, Christopher Johnson, Devin Hebert, and Lenear Boudoin testified at trial, and their testimony largely corroborated that of Ms. Lumar.
Mr. Lumar testified that Ms. Lumar called him the night before the party and told him that she and Taylor had an argument over some photographs of her that she wanted back from him. Mr. Lumar maintained that he approached Taylor at the party to inquire about the photographs and not to start a fight. He testified that he (Mr. Lumar) did not have a weapon nor did anyone else at the party other than defendant.
Mr. Lumar further testified that after the fight started, defendant pulled out his gun, shot toward the crowd, and hit Johnson. Defendant subsequently pointed the gun toward Mr. Lumar, so Mr. Lumar started running. Mr. Lumar testified that he was running sideways when a bullet hit him on his right side and then came out the back side. He went to the hospital where he remained for two days. Mr. Lumar also testified that defendant had nothing to do with the fight, and that he did not know why defendant started shooting at him.
Christopher Johnson testified that, after the fight started, he stood on the other side of a Jeep to try and get away from the fight. While he was standing there, he heard a gunshot. He later realized that a bullet had grazed his right shoulder. He was treated at a hospital and went home that night. Johnson explained that he was not involved in the fight, that he did not know defendant, and that defendant had no reason to shoot him.
*1036 Devin Hebert testified that there were at least thirty to fifty people outside in the parking lot where the fight occurred, and that almost everybody there was from the west bank, except for the four east bank boys, defendant, Ramond Taylor, Quintin Green, and Brian Brown. He further testified that when the fight started, Taylor was near the fence area and wall of the school, that defendant was in front of a car in that same area, and that there was a semicircle of people around the east bank boys. He explained, however, that he did not see the semicircle of thirty to fifty people rush over toward the east bank boys and get involved in the fight.
Dr. Kenneth Mann testified that Mr. Lumar sustained a gunshot wound just above the right iliac crest or top part of the hip bone, and that the bullet exited just above the left buttock. He further testified that the injury did not require surgery, but had the bullet continued in a straight line, it would have been a life-threatening or fatal injury.
Michael Davis, a crime scene technician with the St. John Parish Sheriff's Office, testified that he recovered three spent casings at the scene, one on top of a dumpster and two other ones underneath the dumpster. He explained that the dumpster was located next to a large fence, and that there was a possibility he missed one to four casings.
Charles R. Watson, Jr., a stipulated expert in the field of firearms examination, testified that he examined three .9 mm cartridge cases recovered from the scene, and that all three were fired from the same firearm.
Defendant testified that Taylor and Green went with him to the party, and that Brown met him there. Defendant drove past the entrance to the party and noticed that there were approximately forty or fifty people standing outside. Defendant went around to the front of the school, parked, got out, and walked to the entrance where the party was. By the time they got to the entrance, most of the people who had been outside had gone inside.
Defendant further testified that he and his friends stood near a car and talked among themselves. After that, he stuck his head inside the door to the entrance and saw Ms. Lumar and her friend, Tana Mitchell, and the rest of Ms. Lumar's friends. He spoke to them and walked back outside. He noted that the forty or fifty people who had gone inside were now coming back outside. Defendant realized something wasn't right when he saw Ms. Lumar coming out of another door, walking fast and crying, and pulling on Mr. Lumar and telling him, No, don't go do that.
Defendant testified that after that, Mr. Lumar walked up to defendant and his group and Mr. Lumar pulled up on his own pants and swung his arms like he wanted to fight. Defendant testified that Taylor subsequently hit Mr. Lumar. He explained that as soon as Mr. Lumar hit the ground, four or five guys with Mr. Lumar pushed Taylor to the ground and started kicking and stomping on him. Defendant testified that Green ran from behind him, grabbed one of the guys and pulled him up. When he did that, two or three more guys came and tackled Green, grabbed a chain he was wearing around his neck, and tried to hang him with it.
Defendant testified that he stood there in a state of shock and could not believe what was happening. At that point, twenty or thirty people just started coming. Defendant thought that they were coming over to beat him like they were beating his friends. He was terrified because two of his friends were getting stomped and twenty or thirty people were running at him. He pulled out his gun, and cocked it in the air in order to scare them away.
*1037 However, according to defendant, the people did not stop coming, and he thought he was going to die. He shot twice in the direction of the guys who were over Taylor and once at the guys who were over Green. Defendant testified that there was nowhere to run away, and that they were already surrounded before they knew what was going on. He stated that his back was to the fence. Defendant testified that when he shot the gun, he was not aiming at anyone in particular, but just shot into the crowd.
He maintained that he did not specifically intend to kill Mr. Lumar and Johnson, that he did not actively desire for those men to die, and that he did not know anybody was hit with a bullet. He testified that he thought it was necessary for him to shoot the gun in order to protect himself and his friends, and that he did not think there was anything else he could do to protect himself and his friends. Although his gun held eight bullets, he only shot three times, because by the time he fired the third shot, everybody had already turned around and ran.
Afterwards, defendant stood there and did not run; he was scared and did not know what to do. Green grabbed him and told him they needed to leave. When defendant learned that Taylor had left with Brown, defendant ran to get to his car. When defendant got into his car and got a fair distance from the school, he tried to call Taylor's cell phone but got no answer.
He called his cousin, Darryl Jones, and told him he thought he had shot somebody and asked him what to do. Jones told him to get rid of the gun and go to a hotel and that he would see defendant later. Defendant threw the gun out the window. He received a phone call from his friend, Lance Hamilton, who told defendant that the west bank guys were in his neighborhood looking for him. Defendant was scared and thought they wanted to shoot him, so he went to Metairie and got a hotel room. The next day he called his mother and turned himself into the police.
Defendant admitted that he brought his gun to the party in case something happened, but explained that he was not looking for trouble. He testified that he purchased the gun legally from a licensed retailer, and that it was registered in his name, but that he did not have a permit to carry it. He added that he bought the gun because there was a lot of criminal activity in his neighborhood, that he had been threatened by some guys in the past, and that after he came back from college and started working, his friends thought he had changed and turned against him. Defendant admitted that no one touched or punched him at the party.
Mitchell, Green, Brown, Taylor, and Reginald Duhe testified at trial on behalf of defendant, and their testimony largely corroborated that of defendant.
Additionally, Brown testified that Mr. Lumar was right in front of him and the two of them were about to fight when Mr. Lumar got shot.
Green and Brown testified that they did not sustain any injuries as a result of the fight, and Taylor testified that he did not receive medical treatment after the fight.
Detective Walter Stevens testified that he took statements from Ms. Lumar, Boudoin, Hebert, and Johnson, and that they all told him basically the same thing; that once Mr. Lumar and Taylor started fighting, the guys from the east bank and the west bank came together and there was a big fight or brawl.
Green, Brown, and Taylor (defendant's friends); Richard Wolfe (Councilman for District 3 in St. John Parish); Nora Coxie (a friend of defendant's mother); Catherine Davis (defendant's neighbor); and Marie *1038 Hall (defendant's mother) testified that they were familiar with defendant's reputation in the neighborhood, that he had a good reputation, and that he had a reputation for being peaceful and nonviolent.

LAW
In his only assignment of error, defendant Hall contends that the trial court erred in denying his motion in limine to instruct the jurors that the State had the burden of proof to rebut the justification defense. Although he acknowledges that this Court held in State v. Barnes, 491 So.2d 42 (La.App. 5 Cir.1986) that the defendant has the burden of proving by a preponderance of the evidence that his actions were in self-defense or in defense of others in a non-homicide case, he nevertheless asks this Court to revisit and reverse its ruling in Barnes and to adopt the ruling and analysis of the Fourth Circuit in State v. Fluker, 618 So.2d 459 (La.App. 4 Cir.1993).
Justification is defined in La. R.S. 14:18, which provides in pertinent part:
The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
....
(7) When the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.
The use of force or violence upon another person is justified under certain circumstances as provided in La. R.S. 14:19 as follows:
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
Additionally, one may use force or violence in defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person. La. R.S. 14:22.
In State v. Freeman, 427 So.2d 1161 (La.1983), a non-homicide case, the Louisiana Supreme Court indicated that the defendant in a non-homicide case may have the burden of proving self-defense by a preponderance of the evidence. However, the Freeman court declined to resolve the issue and found that, irrespective of who bears the burden in this case, and even assuming that the State has the burden of proving beyond a reasonable doubt in this non-homicide situation that defendant did not act in self-defense, we conclude that the State has carried its burden of proof. Id. at 1163.
In State v. Barnes, 491 So.2d 42, 47 (La.App. 5 Cir.1986), this Court concluded that the defendant has the burden of proving by a preponderance of the evidence that his actions were in self-defense or in defense of others in a non-homicide case.[1]
That holding was reinforced by State v. Steele, 01-1414 (La.App. 5 Cir. 9/30/02), 829 So.2d 541, 547, writ denied, 02-2992 (La.9/19/03), 853 So.2d 632, wherein this *1039 Court stated: [T]he law in this circuit is that the defendant, in a non-homicide case, has the burden to establish, by a preponderance of the evidence, that he acted in self-defense. State v. Barnes, 491 So.2d 42, 44-47 (La.App. 5 Cir.1986). (Emphasis as found in the original.)
Additionally, in the more recent Fourth Circuit cases of State v. Harris, 02-2099 (La.App. 4 Cir. 3/5/03), 842 So.2d 432 and State v. Rasheed, 02-2100 (La.App. 4 Cir. 2/26/03), 841 So.2d 85, the court appeared to suggest that defendant has the burden of proving self-defense in a non-homicide situation.
Therefore, we find that the trial court did not err in denying defendant's motion in limine.
Furthermore, after considering all of the evidence, the jury obviously concluded that defendant did not act in self-defense or in defense of others when he shot Brian Lumar and Christopher Johnson. Testimony from several witnesses indicated that defendant was not involved in the fight, that he did not get punched or pushed or shoved, that a large group of people were not rushing toward him when he started firing the gun, and that nothing was happening to him at the time he started firing the gun. The evidence also indicates that Brian Lumar was running away from defendant at the time he was shot, and that Christopher Johnson was trying to get away from the fight at the time he was shot.
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 La.App. 5 Cir.1990). The review reveals that the trial court did not properly inform defendant of the commencement date of the two-year period within which to file an application for post-conviction relief. La.C.Cr.P. art. 930.8 provides that a court shall not consider an application for post-conviction relief, including applications which seek an out-of-time appeal, if the application is filed more than two years after the judgment of the conviction and sentence has become final.
Therefore, we instruct the trial court to inform the defendant of the provisions of La.C.Cr.P. art. 930.8 by sending written notice to the defendant and to file written proof that defendant received the notice in the record of the proceedings. State v. Hutchinson, 02-0060 (La.App. 5 Cir. 5/15/02), 817 So.2d 500, 509.
Accordingly, we affirm defendant's conviction and sentence and remand the matter to the trial court for compliance with the above instructions.
AFFIRMED AND REMANDED.
NOTES
[1] The specific issue under consideration in Barnes was whether the trial judge had erred in giving a jury charge that placed the burden of proving self-defense or defense of another by a preponderance of the evidence on the defendant.