922 So.2d 577 (2005)
STATE of Louisiana
v.
Brandy JEFFERSON.
No. 2004-KA-1960.
Court of Appeal of Louisiana, Fourth Circuit.
December 21, 2005.
*583 Eddie J. Jordan, Jr., District Attorney of Orleans Parish, Battle Bell, IV, Assistant District Attorney of Orleans Parish, New Orleans, LA, for Plaintiff/Appellee.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS, JR.).
PATRICIA RIVET MURRAY, Judge.
This is a criminal appeal. Brandy Jefferson appeals his convictions for attempted first degree murder and felon in possession of a firearm, and the related sentences. For the reasons that follow, we affirm the convictions, vacate the sentences, and remand for re-sentencing.

STATEMENT OF THE CASE
On September 3, 2003, Mr. Jefferson was charged by bill of information with one count of attempted first degree murder, a violation of La. R.S. 14:27 and 14:30, and one count of possession of a firearm by a convicted felon, a violation of La. R.S. 14:95.1. At his September 12, 2003 arraignment, he pleaded not guilty. Several motion hearings were held in this case in November 2001 and in April and October 2002. At those hearings, the trial court denied various defense motions. In November 2003, a twelve-person jury tried Mr. Jefferson and found him guilty as charged as to both countscount one (attempted first degree murder) and count two (felon in possession of a firearm).
On December 12, 2003, the trial court sentenced Mr. Jefferson to fifty years at hard labor on count one and fifteen years at hard labor on count two. Both sentences were without benefit of parole, probation, or suspension of sentence; and both sentences were to run consecutively. On March 26, 2004, this court denied Mr. Jefferson's writ application relating to his right to have his conviction reviewed. On July 1, 2004, the trial court adjudicated Mr. Jefferson a fourth-felony habitual offender as to count one. The trial court vacated the original sentence on that count, and re-sentenced Mr. Jefferson to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. This timely appeal followed.

FACTS
On May 17, 2001, Officer Christopher Abbott, a ten-year veteran of the New Orleans Police Department ("NOPD"), was assigned to the First District's Proactive Task Force, a unit whose members dress in fatigues and go out into high crime areas of the community seeking to deter crime. On that morning, however, he had two special assignments. First, he and his partner, Michael Carmouche, were assigned to ride with Officer Corey Brown in the M-COPS van (a police Winnebago) to escort a special event. Second, Officer Abbott was subpoenaed to appear in Orleans Parish Criminal Court and in municipal court.
At about 6:30 a.m. that day, Officer Abbott reported to the police station to help get the M-COPS van ready. Between 8:00 and 9:00 a.m., he left the station in a marked police unit and dressed in full task force uniform to go to criminal court. Upon his arrival, Officer Abbott was told by the assistant district attorney that he was not needed. As he was headed back to the station to meet his partner, he *584 detoured through the 2000 block of Dumaine Street. At the intersection of Dumaine and North Johnson Streets, Officer Abbott observed a young man (later identified as Mr. Jefferson) walking in the middle of the street. The driver of the car in front of Officer Abbott honked at Mr. Jefferson and drove around him.
Officer Abbott likewise drove around Mr. Jefferson, but several factors made him suspicious of Mr. Jefferson: (i) Mr. Jefferson was walking in the middle of the street; (ii) the bold attitude he displayed to the driver of the other car, (iii) the nervousness he displayed upon seeing an officer, and (iv) the bulge in his waistband that appeared to be a concealed weapon (a gun). Given these factors, Officer Abbott decided to investigate. Officer Abbott thus radioed headquarters that he was stepping out of his vehicle on a suspicious person (a "107"), and he made a U-turn so that his vehicle would be facing Mr. Jefferson.
Officer Abbott stepped out of his vehicle and began approaching Mr. Jefferson, who was approximately twenty feet away. As he was approaching Mr. Jefferson, Officer Abbott asked him why he was blocking the street. The closer Officer Abbott came to Mr. Jefferson, the stronger he suspected the bulge in Mr. Jefferson's waistband was a gun. Officer Abbott turned down his police radio and quietly asked for a backup unit, mentioning the codes "107" (suspicious person) and "95G" (95 refers to a weapon and G refers to a gun).
In an attempt to keep Mr. Jefferson from running away before the backup unit arrived, Officer Abbott engaged in conversation with Mr. Jefferson for a few minutes. During this conversation, Mr. Jefferson told Officer Abbott that his uncle was a police officer. Another topic of their conversation was the tattoo on Mr. Jefferson's forehead. Because Officer Abbott could not read what the tattoo said from where he was located, Officer Abbott asked Mr. Jefferson what it said. Mr. Jefferson replied that it said "No Mercy." Another question Officer Abbott asked Mr. Jefferson was what was his name and how to spell it. Mr. Jefferson responded, but was unable to spell the name he provided. Based on his response, Officer Abbott concluded that Mr. Jefferson was engaged in some type of wrongdoing and pushed the emergency red button on his police radio. Mr. Jefferson suddenly grabbed his waist, told Officer Abbott that he had to go, and turned as if to walk away.
In response to Mr. Jefferson's grabbing his waist, Officer Abbott drew his sidearm, pointed it at Mr. Jefferson, and ordered him to put up his hands. Mr. Jefferson responded by removing the gun he was carrying and throwing it down.[1] Because Officer Abbott suspected Mr. Jefferson was going to run, he ordered Mr. Jefferson to turn around, to get on his knees, and to put his hands on top of his head. After Mr. Jefferson complied, Officer Abbott holstered his sidearm and grabbed one of Mr. Jefferson's hands to handcuff him. As Officer Abbott was beginning to handcuff him, Mr. Jefferson pulled another gun and shot Officer Abbott four times. The first two shots hit Officer Abbott in the abdomen and shoulder. The last two shots hit Officer Abbott in the head. Mr. Jefferson then retrieved the guns, including the one he had thrown to the ground, and fled. Officer Abbott radioed that he was shot; this was the "108 call" (officer down and needs assistance).
*585 Officers Carmouche and Brown had heard Officer Abbott's request for backup assistance and were en route when they heard the broadcast of Officer Abbott's 108 call. Officer Rita Franklin[2] was on patrol in the area when she too heard the broadcast of Officer Abbott's 108 call. Those three officers arrived simultaneously at the scene. Officer Abbott gave a description of the shooter to the officers, and Officer Carmouche broadcast that description over the radio. The description, as Officer Abbott testified at a motion hearing, was "a black male with a red T-shirt on and a tattoo of `No Mercy' tattooed across the top of his forehead with long shorts." Shortly thereafter, other officers arrived and transported Officer Abbott to the hospital.
Detective Vernon Haynes was working in the area when he too heard the broadcast of Officer Abbott's 108 call and came to the crime scene. Because there was an adequate police presence at the scene, Detective Haynes searched the neighborhood on foot for the suspect. Detective Haynes, who was familiar with the neighborhood, stopped at a barbershop to inquire if the barber had seen anything. After leaving the barbershop, he noticed that the gate to an alley running alongside the barbershop was open. He drew his sidearm and proceeded down the alley. As he was doing so, Mr. Jefferson walked out from behind a building and asked what was happening. As Mr. Jefferson came closer, Detective Haynes noticed the "No Mercy" tattoo on his forehead. Mr. Jefferson was wearing jean shorts, barefoot, and sweating profusely.
After other officers arrived and placed Mr. Jefferson under arrest, Detective Haynes went back down the alley and found a pair of Timberland boots. About twenty feet away from the boots, he found a sweater and two guns. The sweater and guns were located on the other side of a fence. In the yard behind the barbershop where Detective Haynes found these items there also was an abandoned shed, which was located near the fence.
Shortly after Mr. Jefferson was taken into custody, the police brought Pamela Patterson, an eyewitness to the shooting, from her house at 2030 Dumaine Street, where she witnessed the shooting, to the location where Mr. Jefferson was being held. At that time, Ms. Patterson positively identified Mr. Jefferson as the shooter. According to Ms. Patterson, on the morning of the shooting, she looked out of her window and saw a struggle between a young man (whom she identified as Mr. Jefferson) and a police officer. The young man shot the officer, stood over the fallen officer and shot him again, then grabbed the officer's gun and ran away. She confirmed that when the man shot the fallen officer, he had the gun pointed toward the officer's head. She knew the victim was a police officer because he was wearing a dark colored jump-out outfit or fatigues with the word "police" or "NOPD" printed on the back of it. She did not know how long the officer and the young man had been in the 2000 block of Dumaine Street before the shooting occurred. Ms. Patterson stated that some individuals who lived in the neighborhood were "rooting" the young man on as he was shooting the fallen officer; however, she did not know those individuals by name.
After being released from the hospital on May 30, 2001, Officer Abbott identified a photograph of Mr. Jefferson in a lineup that Sergeant Gerald Dugue, who supervised *586 the investigation, showed him. Although Officer Abbott was certain that the photograph he selected was the person who shot him, he pointed out that there was something missing in the photograph-the "No Mercy" tattoo on Mr. Jefferson's forehead was not in the photograph. A photographic lineup also was shown by Detective Dwight Deal[3] to Corey Lewis, another witness to the shooting. Mr. Lewis was one of the individuals who called 911 to report the shooting.[4]
Lieutenant Steven Gordon, commander of the NOPD communications division, identified the tape recordings of the 911 calls and of Officer Abbott's 108 call. Those recordings were played for the jury at trial. Over defense counsel's objection, Detective Deal was allowed to identify Mr. Lewis's voice on the 911 recording as it was being played. Lieutenant Gordon also identified the log entry from the police radio dispatcher, which reflects the following chronology of events: (i) at 9:16 a.m., Officer Abbott notified the dispatcher that he was making a suspicious person stop; (ii) at 9:19 a.m., Officer Abbott made the 108 call; and (iii) at 9:31 a.m., Officer Haynes discovered the guns in the yard behind the barbershop near the abandoned shed.
On the day of the shooting, the police found a spent bullet or pellet on the sidewalk. On May 24, 2001, about a week after the shooting, a police recruit found a gun inside of a dilapidated box spring on the second floor of the abandoned shed.
NOPD criminalist, Meredith Acosta, who was qualified by stipulation as an expert in the chemical development and collection of latent fingerprints, testified that although she found a partial print on a Winchester .38 special cartridge, she found no identifiable fingerprints on any of the three guns in evidence.
Mr. Jefferson testified at trial in his defense. He admitted six prior convictions: (i) possession of cocaine, (ii) possession of stolen property, (iii) sexual battery, (iv) possession or attempted possession of a firearm by a convicted felon, (v) carrying a concealed weapon, and (vi) flight from an officer. On the date of the shooting, he was not on probation or parole. Although Mr. Jefferson admitted shooting Officer Abbott four times, he claimed he did so in self-defense. According to Mr. Jefferson, the shooting was precipitated by the on-going illicit relationship between himself and Officer Abbott.[5]

ASSIGNMENT OF ERROR NO. 1

PRO SE ASSIGNMENT OF ERROR NO. 5
By these assignments of error Mr. Jefferson contends the evidence is insufficient to support his convictions for attempted first degree murder and possession of a firearm by a convicted felon. When, as in this case, issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Marcantel, XXXX-XXXX, p. 8 (La.4/3/02), 815 So.2d 50, 55. The standard for reviewing *587 a sufficiency of the evidence claim is well settled; to-wit:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v, Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).

State v. Brown, XXXX-XXXX, p. 22 (La.4/12/05), 907 So.2d 1, 12; see also State v. Sykes, XXXX-XXXX (La.App. 4 Cir. 3/9/05), 900 So.2d 156.
Mr. Jefferson challenges the sufficiency of the evidence as to both of the crimes for which he was convicted, attempted first-degree murder and possession of a firearm by a convicted felon.
First degree murder is defined as including the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm upon a peace officer engaged in the performance of his lawful duties. La. R.S. 14:30(A)(2).[6] Attempt is defined as occurring when a person, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object; it is immaterial whether he would have actually accomplished his purpose. La. R.S. 14:27(A). To prove attempted murder, the State must prove that the defendant had the specific intent to kill and committed an overt act tending toward the accomplishment of that goal; proof of intent to inflict great bodily harm is not enough. See State v. Whins, 96-0699, p. 3 (La.App. 4 Cir. 4/9/97), 692 So.2d 1350, 1353.
Mr. Jefferson contends that the State failed to prove either that he had the specific intent to kill Officer Abbott or that he did not shoot the officer in self-defense. He also contends that, at worst, he is guilty of attempted second degree murder because Officer Abbott, albeit employed and dressed as a peace officer, was not acting as a peace officer when he shot him.
Addressing first the self-defense issue, La. R.S. 14:19 provides that "[t]he use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person ... provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide." La. R.S. 14:19. In a non-homicide case when the defendant asserts the killing was committed in self-defense a dual inquiry is required; to-wit: "first, was the force used objectively reasonable under the circumstances and secondly, was the force used apparently necessary to prevent the assault or offense." Ginger Roberts Berrigan, Louisiana Criminal Trial Practice § 21-19 (3d ed.1998); State v. Freeman, 427 So.2d 1161 (La.1983).
Four situations in which a homicide is justifiable are enumerated in La. R.S. 14:20. In a homicide case, it is settled that the State bears the burden of proving beyond a reasonable doubt that the killing *588 was not committed in self-defense. State v. Osborne, XXXX-XXXX, p. 7 (La.App. 4 Cir. 12/6/00), 775 So.2d 607, 611. In a non-homicide case, however, the placement of the burden of proof is unsettled.
In State v. Fluker, 618 So.2d 459 (La. App. 4th Cir.1993), this court noted that Louisiana appellate courts were divided on the placement of the burden of proof of self-defense in non-homicide cases. We further noted that several circuits had held the burden of proof is on the defendant to prove self-defense by a preponderance of the evidence. Fluker, 618 So.2d at 462-63. Nonetheless, we reasoned that whenever an issue of exculpatory circumstances exists, it should be the State's burden to disprove such a claim of innocence. We thus concluded that the State has the burden of disproving self-defense beyond a reasonable doubt in both homicide and non-homicide cases. Recently, however, in State v. Wischer, XXXX-XXXX (La.App. 4 Cir. 9/22/04), 885 So.2d 602, a divided panel of this court held that in non-homicide cases the defendant has the burden of proving the affirmative defense of justification, i.e., self-defense, by a preponderance of the evidence.
Although we acknowledge the apparent conflict between Wischer and Fluker on this issue,[7] we find it unnecessary to resolve that conflict in this case. Regardless of whether Mr. Jefferson or the State has the burden of proof on this issue, the evidence presented, when viewed in light most favorable to the prosecution, is sufficient to prove either that Mr. Jefferson failed to prove by a preponderance of the evidence that he acted in self-defense or that the State proved beyond a reasonable doubt that Mr. Jefferson did not act in self-defense.
At trial, Mr. Jefferson and Officer Abbott gave dramatically different versions of the events precipitating the shooting. As noted, Mr. Jefferson acknowledged that he shot Officer Abbott four times, but claimed he did so in self-defense and that the shooting was precipitated by an on-going illicit relationship between himself and Officer Abbott.
According to Mr. Jefferson, he first met Officer Abbott in late January or early February 2001 when Officer Abbott stopped him. At that time, Mr. Jefferson was driving away from the Rainbow Motel where he used to sell crack cocaine out of a motel room. Mr. Jefferson told Officer Abbott that he was not a permanent drug dealer, that he had just obtained his GED, and that he was trying to earn money to advance his education. He also told Officer Abbott that his stepfather was a former police officer and suggested that they could work together.
Mr. Jefferson testified that he and Officer Abbott developed a "working relationship." He would pay Officer Abbott money in exchange for "protection"i.e., for the police to look the other way and give him and other drug dealers at the Rainbow Motel a license to deal drugs without being arrested. Officer Abbott also would keep Mr. Jefferson informed of which drug dealers the police were targeting. Mr. Jefferson characterized his role in this relationship as a middleman in a conspiracy between Officer Abbott (and other officers) and other drug dealers.
Mr. Jefferson testified that the amount of protection money he paid Officer Abbott varied. He stated that on the first occasion *589 he paid him $250, but that sometimes when they met he would pay him $1,000 and sometimes $2,500. He met Officer Abbott sometimes twice a week, sometimes once a week, and sometimes once every two weeks. He did so over a period of about three months. He clarified that he did not give Officer Abbott money every time they met and that the majority of the money he gave Officer Abbott came from other drug dealers who sold more drugs than he did and from whom he obtained the drugs he sold. Mr. Jefferson identified by name several other officers besides Officer Abbott who were involved in the conspiracy. One of the officers Mr. Jefferson identified was Officer Haynes, the officer who arrested Mr. Jefferson.
Mr. Jefferson testified that at some point before May 17, 2001, he began avoiding Officer Abbott for two reasons. First, he owed Officer Abbott protection money pursuant to the conspiracy. Second, Officer Abbott wanted him to kill Lionel Nelson, a marijuana dealer whom Officer Abbott unsuccessfully attempted to shake down in the French Quarter and who filed a false arrest claim against the officer.
On May 17, 2001, Mr. Jefferson encountered Officer Abbott when he was en route to his mother's house to retrieve a letter. The letter contained the instructions regarding the rehearsal scheduled for 4:00 p.m. that day that he was required to attend for his upcoming GED graduation ceremony. Officer Abbott drove up to the corner of Dumaine and North Johnson Streets, leaned out of the window of his police car, and called Mr. Jefferson to come over. Mr. Jefferson did not want to meet with Officer Abbott at that location because there were people in the neighborhood on their porches as well as a school nearby. Although Mr. Jefferson waved him off, Officer Abbott persisted. Mr. Jefferson thus walked over to the police car and engaged in a lengthy conversation with Officer Abbott through the car window.
Mr. Jefferson stated several times in his testimony that this conversation with Officer Abbott lasted for approximately twenty-five minutes. He further stated that during the last five minutes of the conversation Officer Abbott stood next to his police car. He still further stated that Officer Abbott talked on his police radio several times during the conversation. In that conversation, Officer Abbott initially asked Mr. Jefferson for the protection money he owed him. Officer Abbott also asked him to deliver two guns he had in his possession to some people in the neighborhood, but Mr. Jefferson refused. Mr. Jefferson informed Officer Abbott that he wanted to end the conspiracy and that he would find him a reliable replacement. He also told Officer Abbott that if he discovered the police had anything to do with the recent mysterious killing of his cousin, he was going to the FBI. Mr. Jefferson then walked away from the police car.
When Mr. Jefferson walked away, Officer Abbott become enraged. Out of the corner of his eye, Mr. Jefferson observed Officer Abbott rooting in his police car for something. As he continued walking away, Mr. Jefferson turned to see Officer Abbott in a "red-faced, blind rage" running towards him at full speed. Mr. Jefferson had no weapons on his person and feared for his life. He started running towards a residence with a screened in porch on which people routinely could be found.
Officer Abbott drew his gun and pointed it at Mr. Jefferson. Mr. Jefferson turned his back and dared Officer Abbott to shoot him in the back. Officer Abbott threw a gun down to the ground and ordered Mr. Jefferson to pick it up. Mr. Jefferson refused. Officer Abbott pulled a gun and hit Mr. Jefferson in the mouth, *590 chipping his teeth. Mr. Jefferson reflexively grabbed the gun, and they struggled. Mr. Jefferson, who weighed about 135 pounds, was a much smaller person than Officer Abbott. Officer Abbott was able to wrest the gun from Mr. Jefferson's grip. Mr. Jefferson fell backward to the ground and grabbed the gun that Officer Abbott had earlier thrown down. In that split second, Officer Abbott pulled the trigger, but his gun misfired. In the next split second, Mr. Jefferson turned and shot Officer Abbott in the abdomen. Officer Abbott dropped his gun and grabbed his stomach area.
Attempting to escape, Mr. Jefferson ran past Officer Abbott. As he was doing so, he observed Officer Abbott attempting to grab his gun. Mr. Jefferson thus shot Officer Abbott in the back, and the officer fell to the ground. After he fell, Officer Abbott attempted to point his gun at Mr. Jefferson. Mr. Jefferson said he "did what [he] had to do," and fired two more shots at the downed officer's head. He then stepped on Officer Abbott's right hand. Mr. Jefferson explained that he shot at Officer Abbott's head because he was unsure if the officer was wearing body armor. He further explained that he hoped he had not killed Officer Abbott and thus he was relieved when he saw Officer Abbott reach for his police radio.
After disarming Officer Abbott, Mr. Jefferson picked up the other gun from the ground and a fourth gun that Officer Abbott was carrying in the small of his back and fled. He testified that he knew if he remained at the scene the police would shoot first and ask questions later.
Mr. Jefferson testified that after he ran a short distance from the original crime scene, he stopped, took off his shirt, and wrapped the guns up in it. He explained that he did so because he was concerned one of the guns might accidentally discharge. According to Mr. Jefferson, a guy name Mike, whom he identified as Ms. Patterson's boyfriend, was sitting on Ms. Patterson's porch at the time of the shooting. Mike ran with Mr. Jefferson from the crime scene. He and Mike went into an abandoned shed. While inside the shed, Mr. Jefferson took out the four guns he had inside of his shirt. He and Mike each took two of the guns. Mr. Jefferson then told Mike he was going to turn himself in. He and Mike then went their separate ways.[8]
Mr. Jefferson testified that he turned himself in to Officer Haynes, whom he identified as part of the conspiracy. He testified that when he initially came up the alley near the barbershop, he observed Officer Haynes talking to the barber. He went back down the alley where he discarded the Timberland boots he was wearing and the two guns he was carrying. He then walked out and surrendered himself to Officer Haynes.
Mr. Jefferson testified that the gun he used to shoot Officer Abbott was an automatic weapon that the police never found. He further testified that Officer Abbott never attempted to handcuff him that day.
Officer Abbott, on the other hand, testified that he first encountered Mr. Jefferson on the day of the shooting. As noted earlier, Officer Abbott testified that he was on his way back to the station from court when he radioed the dispatcher that he was stopping to investigate a suspicious person (later identified as Mr. Jefferson) *591 carrying a concealed weapon. Officer Abbott further testified that as he was beginning to handcuff Mr. Jefferson, Mr. Jefferson pulled another gun and shot him. The first shot hit Officer Abbott in the abdomen. As Officer Abbott reached for his gun, Mr. Jefferson fired a second shot, which hit Officer Abbott in the left shoulder. The impact of that second shot caused Officer Abbott to fall to the ground. Officer Abbott again reached for his gun, but Mr. Jefferson pushed him to the ground and shot him a third time. The third shot ricocheted off the top of Officer Abbott's head. Officer Abbott again reached for his gun, but Mr. Jefferson fired a fourth shot, which hit Officer Abbott in the head. Mr. Jefferson retrieved the guns and fled. Officer Abbott then made the 108 call on his police radio.
On appeal, Mr. Jefferson argues that his claim of self-defense is supported by his testimony that Officer Abbott came after him in a "red-faced, blind rage" in response to his threat to expose the illicit scheme to the FBI. He further argues that Officer Abbott tried to fire at him first, but the officer's gun misfired. He still further argues that his claim of self-defensethat Officer Abbott was the aggressoris supported by the testimony of the State's eyewitness, Ms. Patterson that she saw a "struggle." Finally, he argues that he was in fear for his life that day because of an earlier incident during which several other officers involved in the conspiracy threatened to kill him.
As to his claim that he was in fear due to an earlier incident, Mr. Jefferson testified at trial that he was riding his bike at night when some other officers involved in the conspiracy attempted to run him over with a car and started shooting at him. He explained that the officers were after him because they had discovered that he was keeping some of the protection money he, as a middleman, was supposed to pay them pursuant to the conspiracy. The officers chased him into the house of Camella Harris, a friend of his aunt. After the officers caught him, they told him they would kill him next time. Officer Abbott came to the Harris's house after the other officers had already entered it. Officer Abbott denied ever having gone to the Harris's house. Although the Harris family testified for the defense at trial regarding the incident, their testimony was inconsistent.[9]
An integral part of Mr. Jefferson's testimony regarding the alleged illicit relationship between himself and Officer Abbott is his claim that they engaged in a twenty to *592 thirty minute conversation through the window of the police car before the shooting occurred. Mr. Jefferson contends that defense witnesses corroborated his testimony regarding such a lengthy conversation. However, only one defense witness testified regarding such a lengthy conversation, Billie Jacobs. According to Mr. Jacobs, he observed an officer talk to an individual through the window of his vehicle for about twenty minutes.[10] No other witness, besides Mr. Jefferson, testified about such a lengthy conversation.
The State, however, conceded that at least three other witnesses who did not testify mentioned a conversation lasting approximately twenty to thirty minutes. Sergeant Dugue admitted that a witness who was adamant about not identifying himself provided the police with information regarding the shooting. This unidentified witness stated that Officer Abbott and an individual talked for thirty minutes before the shooting. Sergeant Dugue also admitted that another witness, Mr. Lewis, said there was a conversation that lasted twenty to thirty minutes. After refreshing his memory with a copy of his report, Sergeant Dugue said that someone named Raymond James also had informed the police of a conversation that lasted twenty to thirty minutes.
Officer Abbott denied engaging in such a lengthy conversation with Mr. Jefferson. His testimony on this point is corroborated by Lieutenant Gordon's testimony regarding the entries in the police radio dispatcher log from the date of the shooting. As noted, the log reflects that Officer Abbott notified the dispatcher that he was making a suspicious person stop at 9:16 a.m. and that the "officer down" radio call came in from Officer Abbott at 9:19 a.m., three minutes later.
As to Mr. Jefferson's claim that Officer Abbott fired the first shot, Officer Abbott denied ever firing his gun. Moreover, Officer Abbott denied virtually all the pertinent facts that Mr. Jefferson testified to regarding the alleged illicit relationship between them; particularly, Officer Abbott denied the following:
 having any prior relationship with Mr. Jefferson before the day of the shooting;
 having a conversation with Mr. Jefferson that day through the window of his police car;
 having a conversation with Mr. Jefferson that day regarding Mr. Jefferson's paying him protection money; and
 going to the Rainbow Motel on several prior occasions and taking money from persons instead of arresting them.
The record thus reflects that Mr. Jefferson and Officer Abbott gave dramatically different versions of the events precipitating the shooting.
Mr. Jefferson's final argument regarding his self-defense claim is that his testimony regarding Officer Abbott being the aggressor is corroborated by the testimony of the State's eyewitness, Ms. Patterson, that she looked out of her window and saw a "struggle." However, Officer Abbott testified that when Mr. Jefferson pulled out a second gun and shot him, Mr. Jefferson was on his knees, and Officer Abbott had a grip on one of Mr. Jefferson's arms, preparing to place a handcuff on one of his wrists. Ms. Patterson could have viewed this as a struggle. Moreover, Ms. Patterson testified that some individuals in the *593 neighborhood "rooted" Mr. Jefferson on to shoot the fallen Officer Abbott. This testimony clearly belies any claim of self-defense.
Mr. Jefferson also contends that the State failed to meet its burden of establishing that at the time of the shooting Officer Abbott was engaged in his lawful duties as a "peace officer," which is an essential element of the crime. Mr. Jefferson stresses that at the time of the shooting Officer Abbott had not checked in with the police dispatcher as available to take calls. However, Officer Abbott as well as two other officers, Officers Brown and Franklin, testified that Officer Abbott was working that day. Officer Abbott began the day by riding in the M-COPS van escorting a special event and then appeared in court in response to two subpoenas. He was returning from court when he encountered Mr. Jefferson. He was attempting to handcuff Mr. Jefferson when he was shot four times.
Mr. Jefferson also cites the fact Officer Abbott was in violation of a departmental rule requiring officers to wear body armor while on duty. Officer Abbott acknowledged this violation, but explained that he did not wear his body armor to go to court because it is uncomfortable. NOPD Captain Michael Pfieffer testified that he believed he wrote the departmental rule requiring the wearing of body armor. He testified that the rule contained an exception for officers working in a "purely administrative assignment." The thrust of Captain Pfieffer's testimony was that officers were not held to the rule while in court because they were not in a street situation. The record thus supports the finding that Officer Abbott was acting as a peace officer at the time of the shooting.
Mr. Jefferson still further contends the evidence was insufficient to support a finding that he specifically intended to kill Officer Abbott. However, Mr. Jefferson admitted that he shot Officer Abbott four times, including twice in the head. He testified that the reason he fired two shots at Officer Abbott's head, as the officer lay on the ground after having been shot once in the abdomen and once in the shoulder, was because he did not know whether the officer was wearing body armor that would stop a bullet to the torso. This evidence clearly is sufficient to support a finding of specific intent to kill. Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of attempted first degree murder were proved beyond a reasonable doubt.
Turning to the other crime, Mr. Jefferson contends the evidence was insufficient to convict him of possession of a firearm by a convicted felon. La. R.S. 14:95.1 makes it unlawful for any person who has been convicted of certain felonies to possess a firearm or carry a concealed weapon. Mr. Jefferson concedes that the State established the fact of his status as a convicted felon under La. R.S. 14:95.1, but argues that the evidence is insufficient to establish the other essential element of that crimepossession of a firearm or carrying a concealed weapon. At trial, Mr. Jefferson denied ever carrying a gun, even as a drug dealer. Mr. Jefferson contends that he was not armed on the day of the shooting and that he acted in self-defense when he picked up the gun Officer Abbott threw to the ground so he could shoot the officer. Put another way, Mr. Jefferson claims he temporarily possessed and used the gun (or guns) in self-defense. He claims this is insufficient to establish the essential element of possession. This testimony was contradicted by Officer Abbott's testimony that Mr. Jefferson pulled a gun from his waistband.
*594 Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the offense of possession of a firearm by a convicted felon were proved beyond a reasonable doubt.

ASSIGNMENT OF ERROR NO. 2
In this assignment of error, Mr. Jefferson contends the trial court violated his constitutional right to confront his accusers by improperly denying him an opportunity to cross examine Officer Abbott concerning two matters: (i) a pending 2003 misdemeanor charge against him in Jefferson Davis Parish, and (ii) a judgment rendered against him in a federal lawsuit for false arrest.
We readily dispose of Mr. Jefferson's argument as it pertains to the judgment in the federal lawsuit. The record reflects that Mr. Jefferson was allowed to question Officer Abbott about that judgment. Defense counsel asked Officer Abbott on direct examination whether he had ever arrested someone unreasonably and without probable cause. Defense counsel also asked Officer Abbott if he recalled an incident in the French Quarter involving Michael Callo, the plaintiff in the federal lawsuit. Officer Abbott answered in the negative. However, when defense counsel mentioned a lawsuit, Officer Abbott answered that he recalled a lawsuit, but did not recall the name of the plaintiff. Although at that point the prosecutor objected, the trial court allowed defense counsel to continue pursuing that line of questioning. Officer Abbott then testified that he recalled that the incident involved in the lawsuit occurred at 4:00 a.m. in the French Quarter at the corner of Bourbon and St. Louis Streets where he arrested someone with an affidavit for public intoxication. However, he testified that he did not recall a judgment being rendered against him in that lawsuit. At that point, defense counsel said "That's fine, sir," and the trial court instructed defense counsel to move on. At no time did Officer Abbott deny anything about the judgment against him in the federal lawsuit. The record reflects that defense counsel was not denied the right to question Officer Abbott regarding the judgment in the federal lawsuit.
Turning to the pending 2003 misdemeanor charge against Officer Abbott, the State, before the trial, filed a motion in limine seeking to exclude reference at trial to that criminal charge against the victim. In that motion, the State noted that in September 2003, over two years after the shooting incident at issue, Officer Abbott was charged with simple assault, a misdemeanor. The incident that led to that charge arose out of highway incident in Jefferson Davis Parish. The State argued that even assuming the 2003 misdemeanor charge was somehow relevant, it should be excluded because introducing it at trial would be substantially more prejudicial than probative.
At trial, this issue arose when defense counsel sought to question Officer Abbott on direct examination about the 2003 Jefferson Davis Parish incident. Defense counsel indicated that this line of questioning was intended to show that Officer Abbott was not being truthful when he testified that he never carried more than one gun and that he only would draw his weapon if he believed his life was in danger or if he was trying to protect someone else. When this evidentiary issue arose at trial, the trial court agreed with the State and refused to allow defense counsel to cross-examine Officer Abbott regarding the Jefferson Davis Parish misdemeanor charge. Defense counsel, however, was allowed to *595 proffer this evidence.[11]
Mr. Jefferson claims the trial court erred because this evidence is admissible under La. C.E. art. 607(C), which permits a party to attack the credibility of a witness by examining him "concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony [i.e., intrinsic evidence]." La. C.E. art. 607(C). He further cites La. C.E. art. 607(D), which provides that extrinsic evidence to show a witness's bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness, and that other extrinsic evidence contradicting the witness's testimony is admissible when offered solely to attack the credibility of the witness, unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. La. C.E. art. 607(D). He still further cites State v. Vigee, 518 So.2d 501 (La.1988), for the proposition that relevant and probative evidence should not be excluded at the cost of the defendant receiving a fair trial.
The admissibility of evidence under both La. C.E. art. 607(C) and (D) is subject to the balancing standard of La. C.E. art. 403, which states that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time. See 1988 Official Comments to La. C.E. art. 607. The jurisprudence has recognized that the rule espoused in Vigee is likewise subject to a balancing standard; "when `prejudice to the prosecution is balanced against defendant's constitutional right to present relevant evidence in support of his defense, [the] balance should be weighed in favor of admissibility in those cases in which the prejudice is minimal.'" State v. Mosby, 595 So.2d 1135, 1138 n. 5 (La.1992)(quoting State v. Vaughn, 431 So.2d 358, 370 (La.1982)). However, as the Supreme Court noted in Mosby, "[u]ltimately, questions of relevancy and admissibility are discretion calls for the trial *596 judge ... [that] should not be overturned absent a clear abuse of discretion." Mosby, 595 So.2d at 1139.
We applied these general principles in our decision in State v. Washington, 99-1111 (La.App. 4 Cir. 3/21/01), 788 So.2d 477, to reject an evidentiary argument strikingly similar to the one Mr. Jefferson raises here. In Washington, the issue was whether the trial court erred in granting the State's motion in limine precluding defense counsel from "introduc[ing] or refer[ring] to any conduct by Officer Lampard which was the subject of a newspaper article alleging that he and another officer `jacked people up and stuff like that.'" Washington, 99-1111 at p. 19, 788 So.2d at 493. We noted that the police department had summarily dismissed the matter and that no suspension or conviction of any crime had resulted in connection with the matter. We further noted that defense counsel represented that he did not intend to get into any specifics of the newspaper article, but objected to being precluded from bringing this extrinsic evidence before the jury. We still further noted that it safely could be said that defense counsel wanted "either to question Officer Lampard about some unrelated activities he had been accused of, or to present some extrinsic evidence of such activities, in order to attack the officer's credibility." Washington, 99-1111 at pp. 19-20, 788 So.2d at 493. Rejecting the defendant's arguments, we found neither an evidentiary error nor a confrontation violation. Rather, we concluded that "[d]efendant fails to show that the trial court abused its discretion in implicitly finding that allowing defense counsel to bring out this evidence was either not relevant to the issue of credibility or, if relevant, its relevance was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Washington, 99-1111 at p. 23, 788 So.2d at 496.
As in Washington, we find no error in the trial court's apparent conclusion that any possible relevance of the 2003 Jefferson Davis Parish misdemeanor charge is substantially outweighed by the potential prejudice, confusion of the issues, or misleading of the jury. We also find that reference to the misdemeanor charge is improper under La. C.E. art. 609.1, which states that generally only offenses for which the witness has been convicted are admissible in criminal cases and that no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal. Although a well-settled exception is recognized to establish a witness's bias or interest that may arise from arrests or pending criminal charges, or the prospect of prosecution,[12] this exception is inapposite here. We thus find this assignment of error unpersuasive.

PRO SE ASSIGNMENT OF ERROR NO. 1
In his first pro se assignment of error, Mr. Jefferson contends the trial court erred in qualifying Detective Deal as an expert in voice analysis. This argument is based on the trial court's overruling of defense counsel's objection to Detective Deal identifying Mr. Lewis's voice when the 911 recording was played at trial.
La. C.E. art. 701 permits a lay witness to testify in the form of opinions or inferences as long as those opinions or inferences satisfy two requirements: (i) the *597 opinions are rationally based on the perception of the witness, and (ii) they are helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.
By way of example, in State v. Davis, XXXX-XXXX (La.App. 4 Cir. 2/14/01), 781 So.2d 633, we found La. C.E. art. 701 applied to allow a cash management supervisor to identify a defendant's handwriting. In that case, the defendant was charged with theft of cash payments received by him from patients during the course of his employment as a supervisor of bank transactions at LSU Medical Center ("LSU"). LSU's cash management supervisor identified the defendant's handwriting on a document admitted into evidence. On appeal, the defendant raised a claim of ineffective assistance of counsel because defense counsel failed to object to that handwriting identification testimony on the ground that the managing supervisor had not been qualified as an expert in handwriting analysis. Rejecting that claim, we cited La. C.E. art. 701. We reasoned that the managing supervisor's identification of the defendant's handwriting was rationally based upon her personal observations of the defendant's handwriting. We also noted that the defendant had admitted that the signature on the document was his.
In this case, Detective Deal testified that he was able to recognize Mr. Lewis's voice based on the time he spent with him. During his investigation of the shooting, Detective Deal interviewed Mr. Lewis at police headquarters in August 2001; that interview was recorded.[13] During the week of the trial, Detective Deal located Mr. Lewis and had a lengthy meeting with him. During that meeting, Detective Deal testified that he played for Mr. Lewis the tape from their August 2001 interview and "the 911 tape of his call into police headquarters on the morning that he witnessed the shooting." Although Mr. Lewis agreed to testify at trial, he failed to appear.[14]
Given these circumstances, we find the record supports the trial court's apparent conclusion that both of the requirements of La. C.E. art. 701 were satisfied. First, Detective Deal's opinion testimony that one of the 911 callers was Mr. Lewis was rationally based on his perception; i.e., his recognition of Mr. Lewis's voice. Second, Detective Deal's testimony was helpful to the determination of a fact in issue; namely, the determination of whether a lengthy (twenty-five to thirty minute) conversation took place between Mr. Jefferson and Officer Abbott before the shooting. As noted, Mr. Lewis was one of the witnesses who stated there was such a lengthy conversation. Moreover, as previously noted, before Detective Deal identified Mr. Lewis's voice on the 911 recording, he testified, without objection, that there was a recording of a 911 call by Mr. Lewis on the day Mr. Lewis witnessed the shooting. We thus find no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 2
In his second pro se assignment of error, Mr. Jefferson argues that the trial court erred in accepting the 911 *598 recording into evidence because no foundation was laid for its admission. The record reflects that defense counsel did not object to the admission of the 911 recording on the ground that no foundation had been laid for its admission into evidence. La. C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and a defendant is limited on appeal to those grounds articulated at trial. State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819; see also State v. Dean, XXXX-XXXX, p. 8 (La.App. 4 Cir. 3/14/01), 789 So.2d 602, 607. Mr. Jefferson thus is precluded from arguing on appeal that the trial court erred in permitting the playing of the 911 recording on the ground that no foundation had been laid for its admission.
In an ancillary argument, Mr. Jefferson contends that under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the out-of-court statements of the 911 callers to the police on the morning of the shooting, which were recorded on the tape, are inadmissible "testimonial" hearsay evidence. In Crawford, the Supreme Court recently held that "testimonial" hearsay evidence is inadmissible unless the witnesses are unavailable and the defendant had a prior opportunity to cross-examine them. The issue Mr. Jefferson raises regarding the application of Crawford to the statements of 911 callers is a novel one.
In a recent decision, the Supreme Court of Minnesota addressed this novel issue and declined to adopt an absolute rule on whether the statements of 911 callers are always "nontestimonial" under Crawford. State v. Wright, 701 N.W.2d 802 (Minn. 2005). Although the court in Wright adopted a case-by-case approach, it stated that "it would be an exceptional occasion when a statement made by a caller during the course of a 911 call would be classified as testimonial." Wright, 701 N.W.2d at 811. We agree. As Mr. Jefferson offers no support for finding the statements made by the 911 callers in this case to be exceptional, we find his reliance on Crawford misplaced. We thus find the trial court did not err in admitting the 911 recording.
Mr. Jefferson additionally argues that the trial court erred in permitting the prosecutor to replay the 911 recording during its rebuttal argument. Defense counsel objected to the replaying of the 911 recording on the ground that it was outside the scope of proper rebuttal and then exited the courtroom while the recording was replayed for the jury. During his counsel's absence, Mr. Jefferson lodged a pro se objection to the replaying of the recording, stating that it had been played "three times now." After the tape was replayed, Mr. Jefferson lodged another pro se objection, stating that his attorney did not talk about the recording during his closing argument. The trial court overruled all the objections.
On appeal, Mr. Jefferson argues that the replaying of the recording was outside the scope of proper rebuttal, citing La.C.Cr.P. art. 774. That article provides that the State's rebuttal shall be confined to answering the defendant's argument. However, as Mr. Jefferson acknowledges, the 911 recording already had been played three times. Given the tape had been replayed before, even assuming the trial court erred in permitting the prosecutor to replay it again during rebuttal, this was, at most, harmless error. See State v. Snyder, 98-1078, p. 15 (La.4/14/99), 750 So.2d 832, 845.[15] There is no merit to this assignment of error.

*599 PRO SE ASSIGNMENT OF ERROR NO. 3

In his third pro se assignment of error, Mr. Jefferson argues that he was denied his constitutional right to a fair and an impartial trial when the State utilized false evidence and perjured testimony. In analyzing perjury claims, the following standard applies:
Where a prosecutor allows a State witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness's testimony reasonably could have affected the jury's verdict, even if the testimony goes only to the credibility of the witness. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); State v. Broadway, 96-2659, p. 17 (La.10/19/99), 753 So.2d 801, 814; State v. Williams, 338 So.2d 672, 677 (La. 1976). To prove a Napue claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. Broadway, 96-2659 at p. 17, 753 So.2d at 814. Furthermore, fundamental fairness, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. Broadway, 96-2659 at p. 17, 753 So.2d at 814; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the grant of a new trial based upon a Napue violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. United States v. O'Keefe, 128 F.3d 885, 893 (5th Cir.1997).

State v. Greco, XXXX-XXXX, p. 25 (La. App. 4 Cir. 12/17/03), 862 So.2d 1152, 1168-69, writ denied, XXXX-XXXX (La.9/24/04), 882 So.2d 1164.
The first example of testimony Mr. Jefferson characterizes as perjury is Officer Abbott's testimony that on the morning of the shooting he rode in the M-COPS van escorting what he characterized as a "parade" and that he had subpoenas to appear in Orleans Parish Criminal District Court and municipal court before 9:00 a.m., possibly as early as 8:00 a.m. Mr. Jefferson contends that the testimony of Officers Brown and Franklin "shattered" Officer Abbott's credibility.
Officer Brown testified that there was no parade on North Claiborne Avenue that morning. Officer Brown, however, testified that Officer Abbott was with him and Officer Carmouche from approximately 7:00 to 9:00 a.m. that day and that they rode together in the M-COPS van escorting a walk/run. Officer Brown further testified that they returned to the station after escorting the walk/run at about 9:00 a.m. and that Officer Abbott then left the station for a court appearance. Similarly, Officer Franklin testified that she saw Officer Abbott at the First District Police Station around 9:00 a.m. that morning and that at some point Officer Abbott left the police station to go to court.
Officer Abbott may have been mistaken in his testimony characterizing the special event he escorted that morning as a parade; the special event apparently was a *600 walk/run. Officer Abbott also may have been mistaken as to the time he left the police station to go to court. However, these inconsistencies in Officer Abbott's testimony are far from evidencing perjury on his part. Officers Brown and Franklin confirmed the basic facts testified to by Officer Abbott as to his two special assignments on the morning he was shot.
The second example of testimony Mr. Jefferson characterizes as perjury is Officer Abbott's testimony that he carried only one gun and that he only drew his weapon when threatened or in defense of others threatened. Mr. Jefferson contends that Officer Abbott's testimony constituted perjury because the Jefferson Davis Parish police incident report reflected that Officer Abbott had been carrying two firearms while off-duty at the time of that incident and that he drew his weapon. However, Officer Abbott amplified his testimony regarding carrying only one gun by testifying that he carried one gun "on the street" and when "working." In addition, the Jefferson Davis Parish incident report contained a statement by Officer Abbott that he drew his weapon during the incident because he perceived that the Jefferson Davis Parish deputy sheriff had seen a threat.
The third example Mr. Jefferson cites of alleged perjury is Officer Abbott's refusal to admit that he and Mr. Jefferson engaged in a struggle. In support, he cites the testimony of the State's eyewitness, Ms. Patterson, that she observed Mr. Jefferson and Officer Abbott engaged in a struggle. However, as noted earlier, Officer Abbott testified that he was beginning to handcuff Mr. Jefferson, who was in a kneeling position, when Mr. Jefferson drew a gun and shot him. Ms. Patterson may have looked out her window at that moment and perceived what was happening as a struggle.
Finally, we noted that Officer Abbott admitted at trial that since being shot twice in the head his recollection of certain things was somewhat impaired.
In sum, we find what Mr. Jefferson contends is perjury is simply inconsistencies between the testimony of Officer Abbott and other witnesses.

PRO SE ASSIGNMENT OF ERROR NO. 4
In his fourth pro se assignment of error, Mr. Jefferson argues that his constitutional right to present a defense was violated by the trial court's failure to produce the witnesses he requested on his behalf. He claims that he submitted a full witness list to the trial court, which included the names and addresses of all the witnesses he wished to be subpoenaed. Included on this list were three witnesses who he claims were in federal custody at the time of trial: Terence Williams, Keenan Bradford, and Trina Clark. Only Ms. Clark appeared to testify at trial.[16]
*601 In essence, Mr. Jefferson asserts a violation of his right to compulsory process, i.e., to demand subpoenas for witnesses and to have those subpoenas served. This right is embodied in both the federal and the state constitutions and codified in the state statutory law, La. C.Cr.P. art. 731. State v. Lee, 446 So.2d 334 (La.App. 4th Cir.1984). However, this right does not exist in a vacuum; a defendant's inability to obtain service of requested subpoenas will not be grounds for reversal of a conviction or for a new trial absent a showing of prejudicial error. State v. Nicholas, 97-1991 (La.App. 4 Cir. 4/28/99), 735 So.2d 790. To show prejudicial error, a defendant must demonstrate that the absent witness's testimony would have been favorable to his defense and the possibility of a different outcome if that witness were to testify. State v. Duplessis, 2000-2122 (La.App. 4 Cir. 3/28/01), 785 So.2d 939; see also State v. Green, 448 So.2d 782 (La.App. 2d Cir.1984). The jurisprudence holds that prejudicial error arises when the absent witness is "vital" to the defense. Duplessis, 2000-2122, pp. 12-13, 785 at 947; State v. Peterson, 619 So.2d 786, 790 (La.App. 4th Cir.1993).
This court found prejudicial error in State v. Hill, 534 So.2d 1296, 1298 (La. App. 4th Cir.1988). In Hill, we cited two grounds for reversing the defendant's conviction based on violation of his right to compulsory process. First, we found the service of the subpoena on the defendant's witness was improper. The return on the subpoena reflected that the sheriff's office had sought to deliver it on three consecutive days and that on the last of those days it was left on the door. We noted that the subpoena had been delivered incorrectly and that the defense had been misled to believe it had been delivered because it was not returned undelivered. Second, we found the defense witness was a material witness because the case boiled down to a "head-to-head" confrontation between the defendant and the testifying police officer and because had the defense witness testified to support the defendant's story the outcome might have been different.
Such are not the circumstances here. Unlike in Hill, here all that is known regarding the two absent witnesses (Mr. Williams and Mr. Bradford) is that Mr. Jefferson requested that subpoenas be issued for those witnesses and indicated they were in federal custody. Although Mr. Jefferson testified at trial that Mr. Williams was a drug dealer who had prior illicit dealings with Officer Abbott when the officer was in the Sixth Police District, there is nothing in the record to substantiate these allegations as to what Mr. Williams would have testified. As to Mr. Bradford, the record contains no indication as to what he would have testified. The evidence is thus insufficient to support a finding that Mr. Jefferson's right to compulsory process was violated. Nonetheless, because the record is lacking any evidence as to whether subpoenas were ever issued for or served upon Mr. Williams and Mr. Bradford, we reserve *602 Mr. Jefferson's right to raise this issue by application for post-conviction relief.

ASSIGNMENT OF ERROR NO. 3
In his last counseled assignment of error, Mr. Jefferson claims his sentences are constitutionally excessive for four reasons. First, he claims his sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence as a fourth felony offender convicted of attempted first degree murder is unconstitutionally excessive. Second, he claims his maximum sentence of fifteen years for possession of a firearm by a convicted sentence is unconstitutionally excessive. Third, he claims the sentences should be vacated because the trial court failed to articulate reasons for imposing them. Finally, he claims the trial court erred in making the sentences consecutive as opposed to concurrent. We find merit only as to the final claim.
Mr. Jefferson was convicted of attempted first degree murder for which the penalty was imprisonment at hard labor for not less than ten nor more than fifty years. He was sentenced to fifty years at hard labor, but was subsequently adjudicated a fourth felony habitual offender. His original sentence was vacated, and he was re-sentenced under the Habitual Offender Law to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 15:529.1(A)(1)(c)(ii).[17] The life sentence imposed on Mr. Jefferson was the mandatory minimum sentence allowed under the Habitual Offender Law.
Even though a sentence is the mandatory minimum sentence under the Habitual Offender Law, it may still be unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, or is nothing more than the purposeful imposition of pain and suffering and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677; State v. Dorthey, 623 So.2d 1276, 1280-81 (La.1993). However, the entire Habitual Offender Law has been held constitutional, and the mandatory minimum sentences it imposes upon habitual offenders are presumed to be constitutional. Johnson, 97-1906 at pp. 5-6, 709 So.2d at 675; see also State v. Young, 94-1636, p. 5 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 527. Thus, a defendant challenging such a sentence has the burden of rebutting the presumption that it is constitutional. State v. Short, 96-2780 (La.App. 4 Cir. 11/18/98), 725 So.2d 23.
*603 To rebut the presumption that a mandatory minimum sentence is constitutional, a defendant must show by clear and convincing evidence that he is exceptional. Exceptional in this context means that because of unusual circumstances the defendant is a victim of the Legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Lindsey, 99-3302, p. 5 (La.10/17/00), 770 So.2d 339, 343; Johnson, 97-1906 at p. 8, 709 So.2d at 677. "Departures downward from the minimum sentence under the Habitual Offender Law should occur only in rare situations." Johnson, 97-1906 at p. 9, 709 So.2d at 677. This is not such a rare situation. Mr. Jefferson failed to rebut the presumption that the mandatory minimum sentence he received as a habitual offender is constitutional.
Mr. Jefferson next claims that the mandatory minimum sentence should be vacated because the trial court failed to mention any reasons for sentencing, i.e., the sentencing factors enumerated in La. C.Cr.P. art. 894.1. However, "[w]hen the statute provides for a mandatory sentence, it is an exercise in futility for the trial court to enumerate its reasons for sentencing." State v. Green, 99-2847, p. 8 (La. App. 4 Cir. 11/29/00), 779 So.2d 835, 840; see also State v. Brooks, 2000-2337, p. 3 (La.App. 4 Cir. 4/10/02), 817 So.2d 288, 290.
Mr. Jefferson also challenges as excessive his maximum sentence of fifteen years for being a convicted felon in possession of a firearm. On appellate review of a sentence, the only relevant question is "whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959. For sentences within the range provided by the Legislature, a trial court abuses it discretion only if it contravenes the constitutional prohibition of excessive punishment, i.e., imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979).
The sentence for possession of a firearm by a convicted felon under La. R.S. 14:95.1 is imprisonment at hard labor for not less than ten nor more than fifteen years without the benefit of parole, probation, or suspension of sentence. The sentencing range for this crime thus is only five years. Considering the circumstances surrounding Mr. Jefferson's possession of one or more firearms, it cannot be said that the imposition of the maximum fifteen-year sentence is grossly disproportionate to the severity of the crime. Accordingly, the sentence is not unconstitutionally excessive.
As to the trial court's alleged failure to comply with La.C.Cr.P. art. 894.1 in imposing the maximum fifteen-year sentence, the articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. State v. Simmons, XXXX-XXXX, p. 13 (La.App. 4 Cir. 5/14/03), 848 So.2d 58, 67; State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, 819. When the record clearly shows an adequate factual basis for the sentence imposed, re-sentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). A reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D); State v. Smith, 2002-2340, p. 9 (La.App. 4 Cir. 3/12/03), 842 So.2d 1153, 1158, writ denied, XXXX-XXXX (La.10/17/03), 855 So.2d 759. Considering the heinous circumstances surrounding Mr. Jefferson's possession of *604 one or more firearms, one of which he used to shoot a police officer four times, including twice in the head as the wounded officer lay face down on the ground, the record reflects an adequate factual basis for the imposition of the maximum fifteen-year sentence.
Mr. Jefferson's final complaint is that the trial court erred in ordering the running of the two sentences consecutively, as opposed to concurrently. The governing statute is La.C.Cr.P. art. 883. It states:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
La.C.Cr.P. art. 883.
Although Louisiana law favors concurrent sentences for crimes committed as part of a single transaction, a trial judge retains the discretion to impose consecutive sentences on the basis of other factors, including the offender's past criminality and violence in the charged crimes. State v. Thomas, 98-1144, p. 1 (La.10/9/98), 719 So.2d 49; State v. Dempsey, XXXX-XXXX, p. 5 (La.App. 4 Cir. 4/2/03), 844 So.2d 1037, 1040, writ denied, XXXX-XXXX (La.6/25/04), 876 So.2d 823. "Consecutive sentences for crimes arising out of the same act are not per se excessive if other appropriate factors are considered." Dempsey, XXXX-XXXX at p. 5, 844 So.2d at 1040. However, "[w]hen consecutive sentences are imposed for crimes arising out of the same act, the trial court must articulate particular justification for such a sentence beyond a mere articulation of the standard sentencing guidelines set forth in La.C.Cr.P. art. 894.1." Id. In this case, the trial court failed to do so.
Although we acknowledge that the trial court apparently made the sentences run consecutively based on the violent nature of the shooting incident and Mr. Jefferson's past criminality (extensive prior criminal record), the trial court's failure to comply with the requirement that it set forth the particular reasons for making the sentences run consecutively mandates that we vacate the consecutive sentences and remand for re-sentencing.

ERRORS PATENT
A review of the record reveals one error patent. The trial court in sentencing Mr. Jefferson on the felon in possession of a firearm count failed to impose the mandatory fine required by La. R.S. 14:95.1(B). That statute requires the defendant "be fined not less than one thousand dollars nor more than five thousand dollars." La. R.S. 14:95.1. The trial court's failure to impose the mandatory fine required by La. R.S. 14:95.1(B) mandates that we remand for the imposition of such fine. State v. Brown, 2003-2155, p. 5 (La. App. 4 Cir. 4/14/04), 895 So.2d 542, 545 (citing State v. Williams, XXXX-XXXX (La. App. 4 Cir. 10/6/03), 859 So.2d 751).

DECREE
For the foregoing reasons, the defendant's convictions are affirmed, his consecutive sentences are vacated, and this case is remand for re-sentencing in accord with the views expressed in this opinion, including the imposition of the mandatory fine. Defendant's right to raise a compulsory process claim on application for post conviction relief is reserved.
CONVICTIONS AFFIRMED, SENTENCES VACATED, AND REMANDED FOR RE-SENTENCING.
TOBIAS, J., CONCURS AND ASSIGNS REASONS.
*605 TOBIAS, J., concurring.
I respectfully concur in the decision of the majority but write separately to discuss briefly my view regarding the burden of proof of a defendant's claim of self-defense/ justification.
Assuming that an accused establishes a predicate that he or she is entitled to assert a claim of justification,[1] then the accused need only put forth facts sufficient to establish in the trier of fact's mind that the state has failed to prove its case beyond a reasonable doubt. Thus, in my view, the defendant's burden of proof for establishing justification is a preponderance of the evidence, and, conversely the state's burden of proof is to show beyond a reasonable doubt that the defendant's claim of justification should not be given weight. In this sense, I reject an interpretation of the jurisprudence that an accused must establish his or her defense of justification beyond a reasonable doubt. The state has no burden whatsoever to establish for the defendant that the claim of justification has merit.
NOTES
[1] Officer Abbott admitted that he did not knock the gun out of Mr. Jefferson's hand during the shooting incident, contrary to his earlier statement to Sergeant Gerald Dugue that he had done so.
[2] Officer Franklin's surname is listed in the trial record's examination index as Irving, and the record reflects that she was called to the witness stand as Officer Rita Irving. However, when asked to state her name for the record, she said it was Rita Franklin.
[3] At the time of trial, Detective Deal was the chief investigator for the Orleans Parish District Attorney's Office. For ease of reference, we refer to him as Detective Deal throughout this opinion.
[4] At trial, both Officer Abbott and Ms. Patterson positively identified Mr. Jefferson as the shooter. As discussed elsewhere, Mr. Lewis was unavailable to testify at trial.
[5] Mr. Jefferson's lengthy version of the incident as well as the testimony of the defense witnesses is summarized elsewhere in this opinion.
[6] Subsequent to Mr. Jefferson's arrest in the instant case, La. R.S. 14:30 was amended by Acts 2001, No. 1056, § 1 to additionally include under first degree murder the killing of a peace officer when the specific intent to kill or inflict great bodily harm "is directly related to the victim's status" as a peace officer.
[7] See also State v. Hall, 2004-253 (La.App. 5 Cir. 11/16/04), 889 So.2d 1034, 1039 (noting that the Fourth Circuit in State v. Harris, 2002-2099 (La.App. 4 Cir. 3/5/03), 842 So.2d 432, and State v. Rasheed, 2002-2100 (La. App. 4 Cir. 2/26/03), 841 So.2d 85, appeared to suggest the defendant has the burden of proving self-defense in non-homicide cases).
[8] As the State stresses, the defense failed to ask any question of Ms. Patterson regarding her purported boyfriend, Mike, during its cross. Ms. Patterson was the witness who had identified Mr. Jefferson as the person who shot Officer Abbott and who testified at trial.
[9] Camella Harris testified that she knew Mr. Jefferson because his aunt was one of her friends. She testified that a police officer came to her house one day looking for Mr. Jefferson. The officer neither had a search warrant nor arrested Mr. Jefferson. She could not remember whether the officer had his weapon drawn. She admitted she was in a daze at the time and that she did not recall all of the details. Her children, Keisha and Brian Harris, were inside the house at the time. Keisha Harris testified that she recalled the night the police came to their home. She testified that she was awakened by a loud boom and saw Mr. Jefferson holding onto her mother, saying, "They're trying to kill me. There's some people out there trying to kill me." Police officers, who had their guns drawn, took Mr. Jefferson outside to the front of the house where, according to Keisha Harris, there were about seven police cars. She observed an officer walk up each side of her house. She testified that the police did not present her with any documents or tell her anything. Brian Harris testified that Mr. Jefferson was a close friend. He stated that he was awakened one night by a boom and saw Mr. Jefferson rush through his room. He testified that one officer followed Mr. Jefferson through the doorway with a gun drawn and that another officer followed Mr. Jefferson with a holstered gun. According to Brian Harris, Mr. Jefferson was scared and would not let the police take him outside.
[10] Mr. Jacobs, who resided at 2037 Dumaine Street, testified that on the day of the shooting he observed a police officer drive up Johnson Street the wrong way. Mr. Jacobs said he was sitting on his step talking to a friend. He observed an individual talk to the officer, who remained seated in his vehicle, for about twenty minutes. He did not observe the shooting, but came outside to see someone running away and called 911.
[11] A copy of the Jefferson Davis Parish incident report is in the record. It reflects that on September 6, 2003, a citizen driving eastbound on I-10 near Lake Charles, Louisiana blew her horn as she passed by a Jefferson Davis Parish deputy sheriff on a traffic stop. According to the deputy, the citizen's vehicle was being closely followedapproximately two feetby another vehicle being driven by Officer Abbott, who was off-duty, dressed in civilian clothes, and driving a non-police vehicle. The deputy exited his vehicle and saw Officer Abbott approaching the citizen's vehicle with a handgun. The report reflected that the deputy then drew his weapon and ordered Officer Abbott to put down his weapon. Officer Abbott identified himself as a NOPD officer. The report stated that Officer Abbott was carrying a second gun in the small of his back. The citizen and Officer Abbott gave conflicting stories, with the citizen lodging a complaint that Officer Abbott had been tailgating her while they were driving in a construction zone and that she kept tapping her brakes to make him back off. As he finally passed her, she flipped him off, and Officer Abbott's passenger flipped her off. The citizen said Officer Abbott got in front of her vehicle and slammed on his brakes, requiring her to move into the next lane to avoid a collision. Officer Abbott then allegedly kept moving his car into the citizen's lane, requiring her to keep moving over to avoid a collision. Officer Abbott said in his statement to the deputy that the citizen cut in front of him and kept switching lanes to prevent him from passing her. Officer Abbott said that when he observed the deputy draw his weapon, he drew his, believing that the deputy had observed a threat from inside of the citizen's vehicle. The police report listed the citizen as the complainant and Officer Abbott as the suspect, and categorized the offense/incident as a "37 G," i.e., a violation of La. R.S. 14:37 (aggravated assault), using a gun as the instrumentality of the offense.
[12] See State v. Burbank, XXXX-XXXX, p. 2 (La.4/23/04), 872 So.2d 1049, 1050. This exception is premised on the possibility that the State may have some leverage over a witness due to such arrests or pending criminal charges.
[13] As noted elsewhere, Detective Deal also presented a lineup to Mr. Lewis.
[14] At trial, Detective Deal testified regarding Mr. Lewis's unavailability to testify as a witness. Detective Deal testified that he had been unable to located Mr. Lewis for two days. He testified that he tried to locate him. He explained that he went to Mr. Lewis's grandmother's home, where Mr. Lewis generally resided, as well as to his girlfriend's home. He also spoke by telephone with Mr. Lewis's mother.
[15] We note, as a commentator points out, that "[d]uring closing argument, counsel may ... play tape recordings that were admitted into evidence." Ginger Roberts Berrigan, Louisiana Criminal Trial Practice § 23-3 (3d ed.1998)(citing State v. Bonanno, 373 So.2d 1284 (La. 1979)).
[16] At trial, Ms. Clark, who was attired in an Orleans Parish Prison uniform, testified that she was serving time for a possession of cocaine conviction and acknowledged a prior conviction for distribution of cocaine. On cross-examination, she acknowledged a third felony conviction for crime against nature. She also was confronted with 1995 convictions for theft of goods and possession of drug paraphernalia. Ms. Clark testified that she did not know anything about the shooting of Officer Abbott and that she did not personally know the officer. She testified that she knew Mr. Jefferson from the neighborhood where she lived with her grandmother in the 1900 block of St. Ann Street. During the time she lived there, she testified that she saw Mr. Jefferson at the Rainbow Motel, which is located in that block of St. Ann Street. She further testified that several times she observed Officer Abbott and Mr. Jefferson hold conversations "with each other for, like, over 20 or 25 minutes." For this reason, she believed Mr. Jefferson was a police informant. Ms. Clark still further testified that she saw Mr. Jefferson and Officer Abbott conversing on three occasions between February and April 2001. She saw them twice at the Rainbow Motel and once on North Roman Street. She characterized the Rainbow Motel as "a precinct." She said police would just sit there and sometimes would go into the motel rooms and seize drugs from drug dealers but not arrest them. She testified that she had not seen Mr. Jefferson talk to any other police officers besides Officer Abbott. When other officers came around, she said that Mr. Jefferson would try to avoid them by finding a porch to hop onto or a residence to duck into. She denied ever seeing Mr. Jefferson with a gun.
[17] La. R.S. 15:529.1(A)(1)(c)(ii), as in effect at the time of Mr. Jefferson's commission of the instant underlying offense, May 17, 2001, provided that if the fourth felony or any of the prior felonies was a felony defined as a crime of violence under La. R.S. 14:2(13), such as attempted first degree murder, or a drug offense punishable by imprisonment for more than five years, such as Mr. Jefferson's prior conviction for possession of cocaine, the fourth offender "shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence." La. R.S. 15:529.1(A)(1)(c)(ii) was amended by Acts 2001, No. 403, § 2, effective June 15, 2001, and presently the life sentence is mandatory only if the fourth felony and two of the prior felonies are defined as crimes of violence, certain sex offenses, certain drug offenses, crimes punishable by more than twelve years imprisonment, or any combination thereof. Acts 2001, No. 403, § 2 specifically states that it shall have prospective effect only. In State v. Parker, XXXX-XXXX (La.4/14/04), 871 So.2d 317, the Louisiana Supreme Court held that a habitual offender is to be sentenced under the provisions of La. R.S. 15:529.1 that were in effect at the time of the commission of the most recent offense for which the person was adjudicated a habitual offender, specifically addressing and confirming the prospective effect of Acts 2001, No. 403, § 2.
[1] See La. R.S. 14:18, La. R.S. 14:19, and La. R.S. 14:20.