JAMES F. McKAY III, Judge.
11Based on the record before this Court and for the following reasons we affirm the judgment of the trial court.
STATEMENT OF THE CASE
The defendant Ray A. Boudreaux was charged by bill of information on February 21, 2008, with five counts of attempted second degree murder, violations of La. R.S. 14:30.1. The defendant pleaded not guilty at his March 14, 2008 arraignment. The trial court denied the defendant’s motions to suppress the evidence, the statement and identification on April 23, 2008. On June 22, 2008, at the conclusion of a four-day trial by a twelve-person jury, the defendant was found guilty of aggravated battery as to Count One, guilty of attempted manslaughter as to Counts Two, Three and Four, and not guilty as to Count Five. The trial court denied the defendant’s motions for new trial and post verdict judgment of acquittal on July 23, 2008. On July 25, 2008, the trial court sentenced the defendant to two years at hard labor on Count One, five years at hard labor on Count Two, three years at hard labor on Count Three, and ten years at hard labor on Count Four, with ] 2all sentences to run concurrently. The defendant filed a motion for appeal on the day of sentencing, which was granted.
STATEMENT OF FACTS
New Orleans Police Department Detective Jason Giroir testified that on September 16, 2007, he participated in an investigation of a stabbing in the 200 block of Bourbon Street, outside of the club Utopia. Several days later after interviewing an employee of the Déjá vu Bar, James Kes-ler, who provided the detective with a video surveillance tape of the event, Detective Giroir developed the defendant, Ray Bou-dreaux, as a suspect in the September 16 stabbings. The defendant was positively identified in photographic lineups by two of the persons stabbed, Larry Brooks and Carlton Williams, and by a witness, Tyer-eaun Henry. Detective Giroir participated in the arrest of the defendant and a search of his apartment.[1] After being advised of his Miranda rights, the defendant stated that he was sorry. The defendant repeated that sentiment to the media as he was being taken into New Orleans Central Lockup.
On cross examination, Detective Giroir stated that during his investigation he learned that another person, never identified, who was a friend of the defendant, possibly had a knife. That individual was described as a black male, approximately five feet six inches tall, weighing one hundred and sixty-five pounds, wearing dark pants and no shirt. Detective Giroir’s police report noted that another witness, Sharon Rome, had seen a black male, with a blue shirt, stab a female who worked at Utopia, either inside a club or near the club.
*1147 Is James Kesler testified that he installed video cameras for Déjá Vu nationally. He was called to the Déjá Vu bar on Bourbon Street to record onto a CD, and back up, video surveillance footage captured by at least one of two video cameras mounted outside the bar. Kesler identified a CD that he burned.
Jefferson Parish Sheriffs Office Detective Sergeant Darren Monie testified that on September 21, 2007, in the company of two New Orleans detectives, he obtained written consent from the defendant to search the defendant’s apartment, which was located in Jefferson Parish. This was done after he read the defendant his Miranda rights. Detective Sergeant Monie lifted a blanket covering what he believed was a sofa table, to discover it was a box for a thirty-two inch television. He uncovered the box, turned it over, rummaged through the packing material inside, and discovered a knife. Detective Sergeant Monie identified photographs of the defendant’s apartment. He also identified the defendant’s signed written acknowledgement on the back of the consent-to-search form, stating that one large black and silver folding pocket knife with a pocket clip and half-serrated blade was removed from the apartment. Detective Sergeant Monie again advised the defendant of his Miranda rights, and asked the defendant if the knife was the one he used in the stabbing. The defendant had initially said that he had lost the knife he had used and had thrown the bloody clothing in a dumpster or somewhere at Tulane University. The defendant again denied that it was the knife he had used. Detective Sergeant Monie told him they were going to test the knife for blood, and that if it came back positive it would have a negative effect on him. At that time the defendant admitted it was the knife that he had used. Detective Sergeant Monie identified the knife in court.
|4Detective Sergeant Monie confirmed on cross examination that once he encountered the defendant, that the defendant was cooperative and did not ask for an attorney. He confirmed that he was in charge of the scene and directed the crime lab as to what evidence it should collect. He did not take a formal statement from the defendant because it was not his case. He stated that the defendant was upset when he confronted him about the knife.
New Orleans Police Department Crime Lab Officer Tonesha Santemore performed a HemaTrace test on swabs that had already been taken from the knife recovered in the defendant’s apartment. The tests were negative for the presence of human blood. She noted that upon opening the envelope containing the swabs they appeared to be putrefied, possibly from not being stored correctly and that in such a case tests could come up negative. Officer Santemore confirmed on cross examination that one possibility was that there never was any human blood on the knife. She testified on.cross examination that she had tested five-year old evidence with the He-maTrace test that had come back positive for the presence of human blood.
Larry Brooks, a victim in this matter, testified that he had been convicted of simple burglary, first offense carrying of a concealed weapon, first offense possession of marijuana, and battery on a police officer. On the morning of September 16, 2007, he got off work a little after midnight from his job shucking oysters at the Bourbon House. He and his fiancée, Tyereaun Henry, and another couple went out on Bourbon Street. While at Utopia he went to use the restroom. When he came out he saw Henry pushing off some guy, telling him she was married. Brooks came up and told the man she was married to him. Brooks said he and the guy, who was with *1148 three other guys, one of them being the defendant, | ¡¡shook hands, and the others walked off. Brooks subsequently noticed them standing and observing him and Henry. Brooks did not know any of the men. He told Henry he wanted to leave. As Brooks was leaving he saw his friend, Dudley Gaines, “fussing” with one of the guys who was with the defendant. A fight broke out between Gaines and the other man. Brooks said he ducked, almost getting hit. Brooks testified that he began swinging to protect himself from the defendant and a male wearing a black shirt. Brooks said at this point all he saw was a red shirt and a black shirt.
Brooks testified that the defendant and his friend turned around to leave and began to walk away when he heard the defendant saying “F” that, “F” that. Brooks also heard a female say that the defendant had a knife. Brooks turned around to face the defendant but stumbled off the sidewalk and fell on his back. He said a male with a dark shirt stood over him and started swinging but that somebody shoved that guy out of the way. Brooks then noticed a male in an orange or red shirt, whom he identified as the defendant, start swinging at him however; the defendant was pulled off of Brooks by someone. Brooks said when he stood up he notice that he was bleeding from his arm.
Brooks denied having any weapons with him that night. He said the only weapon he carried daily was his oyster shucking knife, and that stayed at home or at work. He did not have it that night. He had no weapons of any kind. Brooks said he suffered seven stab wounds, including one to his chest, one to his side, one to his arm, and three to his back. He displayed the scars from those wounds to the jury. He was in the hospital for approximately two weeks. He identified the defendant in a photographic lineup while still in the hospital.
1 ¡¡Brooks was questioned as the CD containing the video surveillance film of the incident was played for the jury. At the conclusion of his direct testimony he identified the defendant in court as the person who stabbed him. Asked whether he was sure the defendant was the stabber, Brooks replied that he could not be any surer than he was. Brooks confirmed on cross examination that he knew the owner of Utopia, the bouncers, the bartenders, and the shot girls.
The State called Dr. John Hunt, a University Hospital trauma surgeon, who testified that he treated Keith Townsend, another victim of the brawl, for approximately ten stab wounds. Townsend was in critical condition from the stab wounds, as well as from bludgeoning and beating. He had an injury to the right upper lobe of his lung and a severe amount of hemorrhage within the chest cavity. That stab wound was probably five or six inches deep. The right upper lobe of his lung, approximately a third of his right lung, was surgically removed. Townsend had an ongoing source of bleeding finally identified as an injury to the maxillary artery that goes into the maxillary sinus caused by a stab wound that penetrated bone. Townsend had multiple cerebral contusions, which are consistent with blunt force injury to the head. Townsend sustained brain damage, a result of the blunt force injury, and most likely anoxic brain injury, meaning that when his blood pressure was low due to hemorrhagic shock his brain did not receive enough oxygen to sustain it.
When asked on cross examination whether the blunt force trauma suffered by Townsend could have been caused by falling to the ground, Dr. Hunt replied that it certainly could be, but that the fact *1149 that he had more than one contusion suggested that he was struck. Defense counsel followed up by asking if he meant struck by some type of object to the head, and Dr. Hunt replied in the affirmative.
17Keith Townsend testified that he remembered he was on Bourbon Street with some friends on September 16, 2007, naming only “Rocky.” He remembered being stabbed, but not who stabbed him. He did not know how long he was in the hospital. He displayed his scars from the stabbing to the jury.
Dudley Gaines, previously convicted of a felony, carnal knowledge of a juvenile, testified that on the night of September 16, 2007, he went to Chris Owens’ club by himself. Gaines, also known as “G-Nike,” later met Damion “Rocky” Wise, Carlton “Big Baby” Williams, Keith “Twin” Townsend, Dolesha and Larry Brooks on the street. He went to Utopia with Wise, Brooks, Williams and Townsend. He did not have anything to drink at Utopia. He was on the dance floor. He decided to leave and made his way to the door. When he got outside he started arguing with a guy who had been bothering (touching) a female named “Delissa.” Delissa had complained about the guy to Gaines. He fought with the male, who was wearing a black shirt, but they stopped and each went their separate ways. Wise, Larry, Williams and Townsend were outside already, and Gaines said they were fighting, he guessed, with the black-shirted male’s partners. Gaines said he remained in front of Utpoia, but did not see what happened after that. He was talking; someone told him to turn around; and when he did he saw Williams, Townsend and Delis-sa on the ground bleeding. Gaines said he did see not Larry Brooks get stabbed. Gaines did not have any weapons that night and did not pick up any weapons that night. He fought only with the male in the black shirt.
Gaines was asked on cross examination if Larry Brooks had any weapons on him, and Gaines replied in the negative. He said they were just fist fighting.
Damon “Rocky” Wise testified that he had previously been convicted of a felony, distribution of marijuana, and two misdemeanors, theft and resisting arrest. ]8On the night of September 16, 2007, he was with Carlton “Big Baby” Williams. He went to Chris Owens’ club first, but did not have any alcoholic beverages. He then went to Utopia, where he had one alcoholic drink. He went outside and got into a fight that was going on. He said the only person he hit was the defendant who stabbed him in the arm, although, he did not see what the defendant stabbed him with. He did not remember what the defendant was wearing that night but remembered the defendant’s face. Wise replied in the negative when asked whether he had any weapons on him that night.
Carlton “Big Baby” Williams was working as a security guard at a French Quarter club, the Jazz Emporium, on the night of the incident. He was .with Damion “Rocky” Wise, his uncle. He thought they probably went to the Jazz Emporium that night, had a drink and a beer, and then went to Chris Owens’ club. They later met Keith Townsend outside of Utopia. They went into Utopia. Before he could get to the bar, he heard a commotion outside. He turned to see some guy fighting with Delissa, a shot girl who was employed by Utopia at the time. Delissa and the guy were across the street near Déjá Vu. The guy was putting his hands on Delissa, so Williams interceded and began fighting with the guy. He did not recall what the guy was wearing. He had never seen the guy before. Williams did not notice Wise, Brooks or Townsend around *1150 while he was fighting. At one point he felt something in the back of his head, and he turned to see the defendant. Williams said he started swinging in that direction, fighting the defendant. Williams had no weapons. He was fighting the defendant when the defendant hit him under his arm. He said it felt like someone had kicked him, and he could not breathe. He started to go down, and then Wise came and hit the defendant. Williams did not see a knife in the defendant’s hands. Williams did not see what | ¡,was happening to Townsend, Brooks or Wise. Williams said he was stabbed ten times and was in the hospital for a week to a week and a couple of days. Williams identified the defendant in a photo lineup presented to him by a police officer while he was in the hospital. Asked if he was sure the defendant was the person who stabbed him, Williams said: “I’m pretty sure.”
Tyereaun Henry testified that on September 16, 2007, when her fiancé Larry Brooks left her for a while, a male approached and tried to ask for her telephone number. Henry told the guy she had a “fiancé or whatever” the first time he approached. She said he pushed himself on her, so she had to push him off. Brooks told the individual that Henry was his wife. She said the second time the guy hit on her another individual told her that it was cool, that the guy was just drunk. Brooks and the guy who hit on Henry shook hands, and the matter seemed resolved. However, the guy and his companions stood some five feet away, looked at them and made gestures. So she wanted to leave. When they got outside Utopia, the same guy who had hit on her was bothering Delissa, causing him and Dudley Gaines to argue and fight. Another guy came in and tried to hit Brooks, and Brooks started fighting with that individual.
She testified that the defendant had turned to leave but came back saying “ ‘F’ that,” “ ‘F’ that,” and he pulled a knife out of his pocket. She testified that she saw the knife in the defendant’s hand. She then told Brooks to come on because the defendant had a knife. But, as Brooks was backing up he tripped over some trash and fell on his back, still fighting with the same individual. The defendant came and pushed the guy aside and started stabbing Brooks, as Brooks fought back. The defendant left, and Brooks got up but then fell back down.
| j0Henry testified that she was shown a photo lineup by a police officer when she was in the hospital with Brooks. She identified the defendant in the lineup and identified him in court. Henry answered questions as the CD surveillance video was played. She identified the defendant as wearing the red shirt. She was wearing a black shirt and blue skirt in the video.
Ferd Edgar testified that he worked as a security guard at Utopia on September 16, 2007, until probably five or six o’clock in the morning. He was assigned to the front door and could not leave that position. Edgar stated that not everyone coming into the club got searched, only certain people, giving an example of someone wearing a big coat when it is hot outside. Edgar saw a fight break out that night. He said it started between Delissa Ford, a shot girl, and a guy. He said the guy was with the defendant, and the guy was kind of drunk. He bumped Delissa by the front door, and they had a couple of words. Edgar said he told the guy to calm down a little bit, and the defendant also was trying to calm the guy down. The guy pushed the defendant out of the way and walked outside. Dudley “G-Nike” Gaines was already outside, talking to Delissa. Edgar knew Gaines and “Big Baby” Williams from working in French Quarter clubs. *1151 Edgar knew “Rocky” Wise because Wise used to work at Utopia. When the guy came outside, he and Gaines fought. Edgar said after that other people joined in the fight, including the defendant. He said the defendant jumped in and then the defendant pulled out a knife. Edgar saw the defendant stab Williams in the head. Edgar recalled that Wise jumped in, and the defendant turned toward Wise. Delissa hit the defendant with a bottle, and he turned and stabbed her. Keith “Twin” Townsend came into the fight. The defendant stabbed Townsend while Townsend was on the ground, on his back. Edgar saw Larry Brooks get stabbed. | n Edgar said that after the defendant stabbed Townsend he backed off, walking backwards.
Edgar testified that the guy who started the fight was fighting with Brooks. Brooks tripped on the curb, and the defendant came back and stabbed Brooks while he was on the ground. The fight ended after Brooks got stabbed, and the defendant and the two guys he was with ran off towards Canal Street. Edgar identified the defendant in court. Asked how sure he was that the defendant was the person who stabbed all the victims, Edgar replied that he was “real sure.”
Timothy Rockette, the defendant’s older brother, was with his little brother, Jelani Smith, and the defendant on the night of September 16, 2007. They went to a football game and met the defendant’s roommate and teammate, Ade, at Utopia after the game. They also ran into their cousin, Robert, at Utopia. Rockette said Robert was a little tipsy and was not acting like himself. They were trying to talk to girls, and when Robert touched one girl on her arm, she kind of shrugged her arm away. Her boyfriend, whom he later learned was Larry Brooks, came up and started “fussing” with Robert. Rockette said that after that he, the defendant, Smith and Robert thought something bad was going to happen, because Brooks started talking to four or five of his friends in the club. Rockette said that as Brooks talked to his friends he was staring at them, cursing at them, and giving them mean looks. They decided it was time to leave.
Rockette went to the bathroom. When he came out, there were fifteen or twenty people outside, although he did not know if they were together. Rockette said that when they got outside the people were cursing at them, giving them mean looks, calling them “MF’s, B’s, you know, we are going to kill you,.... ” Rockette said he was scared. He, his cousin Robert, and the defendant were at the front Indoor. Carlton “Big Baby” Williams walked up to Robert and said “watch your back, B.” After Williams said that, he hit Robert twice, knocking him out. He said Robert was on the ground in front of Utopia getting stomped on by Williams and at least three other people. Rockette said he was saying that they did not have to fight, that they just wanted to go home, and he said the defendant was saying the same thing. He was trying to grab Williams and get him off of Robert, when Larry Brooks jumped on his back. He said two or three other guys jumped on him at that time. Rockette looked for the defendant and saw him in the middle of the street fighting with four or five guys. His brother, Jela-ni, who had tried to grab Brooks off Rock-ette, was against a wall fighting off people. He saw a girl crack a bottle against the defendant’s head.
Rockette said he, Jelani and the defendant were backing down Bourbon Street toward Canal Street, trying to get to their vehicle parked across Canal Street. Rock-ette said he did not have a shirt on at that time; it had been pulled off him during fighting. He had been wearing a gray *1152 Polo shirt. He said Larry Brooks was still coming towards them. Brooks was saying that they did not know who he was and that he would kill them. Rockette said Brooks’ eyes were “bugged out” real wide. He said Brooks hit him five times, and that each time Rockette would stick out his hands and say: “[W]e don’t want to do this.” They realized their cousin Robert was not with them and started walking back to Utopia to get him. Rockette said the CD video surveillance footage showed him and the defendant walking back to get Robert. He said Brooks was there, still cursing and making threats. Brooks kicked the defendant in the chest. Rock-ette said at that point he rushed Brooks and started fighting him. Brooks ended up on a pile of trash. Rockettte confirmed that the video showed him on top of Brooks. He said they were fighting 113each other; he felt himself get hit in the back and felt a burning feeling in his back. After everything was over he realized he had been stabbed in the back a lot of times. Rockette displayed scars from that night to the jury.
Rockette also stated that the video depicted the defendant coming to pull him up after realizing that Rockette was getting stabbed. Rockette said the guy in the video with the red shirt was a bouncer at Utopia,, and he had seen him working the door that night. Rockette said that as he and the defendant were getting up he realized that their cousin Robert was there. They all then started running. He said that as they were running a female in the video was screaming: “Go get the gun.” They all ran down Bourbon Street toward Canal Street, back to their vehicle. He said he looked back to see a bunch of people running after them. He said the defendant was bleeding from the head and from the arm, and that they went back to Tulane University to wash off and tend to their wounds.
Rockette stated on cross examination that he, his parents, his sister and her husband, and his little brother, Jelani, came in town to see the defendant play football for Tulane that night. After the game they went back to the defendant’s apartment and changed clothes, and he, the defendant and Jelani went to a bar near Tulane, “The Boot,” to hang out with some football players and some friends. He did not have any drinks there. When asked whether he saw the defendant put a knife in his pocket at his apartment, Rock-ette said he did not see the defendant with a knife. They then went to Utopia to meet the defendant’s roommate, Ade. Rockette said he was not drinking because he did not have any money. Their cousin Robert was there and was tipsy. Rockette said Robert was not fighting with “Big Baby” Williams, but Williams hit Robert twice and knocked him to the ground. Rockette replied in the negative when asked whether he ever saw | MWilliams take a blow to his chest with a knife that knocked him to the ground. Rockette said he remembered seeing the person he later learned was Keith Townsend at Utopia. He did not see anyone stab Townsend.
Jelani Smith testified that they met their cousin, Robert, who was kind of drunk, at Utopia. Robert touched a woman’s arm, and she pulled her arm back. Smith said he did not believe Robert had “disrespected” the woman. An individual he later learned was Larry Brooks came up and told Robert the woman was with him. Brooks cursed Robert. Smith said Robert tried to shake Brooks’ hand, but Brooks refused. Smith turned to the defendant and said he had a bad feeling and that they should leave. While the others were waiting for Rockette to come out of the bathroom, Smith, Brooks and the five or six guys with him walked in front of Smith and the defendant, looking at them *1153 like they wanted trouble. As they were walking toward the door, Robert bumped into one of the shot girls working at the club, and she cursed at him. The defendant put his hand on the girl’s hip and told her Robert was drunk and that he was sorry. Smith said he had a brace on his knee because he had torn his meniscus and ACL the week before in a football game.
Smith said that when they got to the door people were outside. The defendant asked the club’s doorman if they could stay inside, saying that they were not from New Orleans and were not trying to get into any trouble. The doorman said they had to leave. The defendant yelled that they did not want any trouble, but Smith said the more the defendant pleaded, the more the people outside started cursing and saying they were going to kill them all. Smith slipped out of the club alone and started to walk toward Canal Street, but did not go all the way down. Robert slipped out of the bar also and got five steps away when a guy three times bigger than Robert, whom Smith later learned was Carlton “Big Baby” Williams, 115told Robert, “B, watch your back.” Smith was a few feet from Robert at that time. Williams hit Robert and knocked him out, and three other people started kicking and beating Robert. Around that time Smith noticed his brother, Timothy Rockette, run out of Utopia hollering that they did not want to fight and then grab Williams. Brooks subsequently jumped on Rockette’s back. Smith pulled Brooks off Rockette’s back and started fighting with Brooks. He said they fought for fifteen or twenty seconds when he got hit in the back of his head. He stepped back, dazed, and saw the defendant fighting five people surrounding him. Smith saw a shot girl hit the defendant in the head with a bottle. Smith thought he recognized the shot girl as one from Utopia.
Smith said the street cleared, and he heard the defendant yelling. The defendant was bleeding from the head and yelled three or four times for people to leave them alone. Smith then heard his other brother, Rockette, saying that he did not want to fight. Brooks approached Rockette, who had his hands out and was backing up. Robert was still on the ground getting beaten, with at least four or five people on him. Williams was still there. The defendant, Smith and Rock-ette started backing up to leave, with Brooks still approaching. Rockette noted that they were leaving Robert. Rockette and the defendant headed back to get Robert. Smith noted that on video surveillance CD that they were out of sight, on the left, toward Canal Street. Then the defendant and Rockette came into the picture on the video as they were going back to get Robert. Brooks is seen approaching them. Robert was still out of view, toward the right, being jumped on by about five guys. Smith came back into the picture, wearing a white shirt and white shoes. He said that right before Brooks hit the ground he saw something in Brooks’ hand. He said it had a sort of brown handle, was rounded at the top, and that it looked like aj^knife, but he could not tell. He said it was a sharp object. Smith said he came in close because Brooks was cutting his brother in the back. Smith said the knife blade “wasn’t like a blade.” He said it was three to four inches long and was kind of rounded— more rounded than pointed.
Smith pointed out on the video surveillance the bouncer who put them out of Utopia; he was wearing a red shirt. Smith said that as they ran he turned to see at least fifteen to twenty people chasing them. He described it as a nightmare. Smith said the defendant received “treatment” at Tulane University the next day, meaning post-game treatment football *1154 players received the day following a game. Smith said the defendant had two gashes in his head and was cut on his wrist.
Jelani Smith estimated on cross examination that at the time of the incident he weighed at least one hundred and ninety pounds. He said he did not drink. Smith replied in the negative when asked whether he ever saw the defendant with a knife on his person when they were at his apartment. Smith said they patted them down when they went into Utpoia that night, but did not check his I.D. He said his cousin Robert tapped the female lightly on her arm and asked her how she was doing. She pulled her arm back and said something like she was married or pointed to Brooks and said he was her fiancée. Smith confirmed that toward the end of the fight Brooks threatened the lives of one or more of them, but had not done so in Utopia itself. Smith said that outside during the fighting they were trying to get away the whole time. He replied in the negative when asked whether he ever saw Carlton “Big Baby” Williams lying on the ground. He never saw Keith “Twin” Townsend lying on the ground. He recalled seeing Townsend in court one time. He said he did not know any of their faces. Smith denied seeing a knife in the defendant’s hand as the defendant and Rockette walked back, and at no 117time did he ever see the defendant with a knife. Smith said the police never came and talked to him.
Andrew Massey was director of athletic training at Tulane University. He testified that the defendant came into his training room while they were doing their normal treatment after a football game. He prepared a handwritten report or chronology of his treatment of the defendant. The defendant had a laceration on his wrist that the defendant reported as receiving in a fall the previous night. The wound was redressed for the next three days. Massey replied in the negative when asked whether he noticed any other injuries to defendant besides the cut on his wrist.
Lionel Rayford testified that on September 16, 2007, he was working at Bourbon Cowboy, a club owned by the same company that owned the Cat’s Meow and Utopia clubs. He watched over the other security guards at the club. Rayford was' familiar with the defendant from seeing him at the Cat’s Meow. They would talk. He did not know the defendant’s name at that time. Rayford saw the defendant on September 16, 2007. That night the defendant came to the Bourbon Cowboy to ask Rayford if he could get him and his family members into Utopia. He walked them down there and got them in. He witnessed the defendant and the people he was with being patted down. Rayford stayed around for ten minutes or so. Before he left he asked the defendant if he was going to be all right, because it was a rowdy crowd. Ray-ford said by rowdy crowd he meant that they used to get a lot of fights inside of Utopia. Rayford went back to the Bourbon Cowboy, closed it up, and then walked back toward Utopia. He said there was big crowd in the middle of Bourbon Street, in front of Utopia. He recognized Carlton “Big Baby” Williams, Larry Brooks, Damion “Rocky” Wise, and Keith “Twin” Townsend. | lsRayford said he grew up with them, had known them for four years, and that they were known for fighting. He said Williams was known for knocking people out. Rayford also stated that Dudley “G-Nike” Gaines was there and that he was “the main person instigating everything.” Rayford said Gaines was looking toward the door, toward the defendant and his family, and calling them “ho’s” and saying “f you’s,” and using other foul language. Rayford testified that there were about seven more people outside, in addition to Williams, Brooks, Wise, Townsend *1155 and Gaines. He said it was between four and five a.m., and people were rowdy and intoxicated.
Rayford said three people were with the defendant. They were inside behind two security guards. A security guard was pushing them out. One of the defendant’s companions was trying to sneak out. One got a little bit away, but “Big Baby” Williams knocked him out, completely. Rayford saw Brooks fighting with one of the defendant’s family members. “Rocky” Wise joined in. “G-Nike” Gaines backed up. He was intoxicated. Rayford said Gaines was known to be intoxicated and to start things. The defendant was fighting with Wise and “Twin” Townsend. The defendant’s companion, who got knocked out by Williams, got up and was fighting with Brooks. One of the shot girls, Gaines’ girlfriend, came out of Utopia and started fighting. She threw a Heineken bottle that hit the defendant in his head. The defendant started backing up. Another shot girl came and hit the defendant in the head with a bottle.
Rayford said the fight started moving toward Canal Street. He did not know why, except that it seemed like the defendant and his family were trying to get away. Rayford testified that one of the defendant’s family members was getting away, and Williams, Wise and Townsend caught him and started beating him. 119TMS fight was out of range of the video surveillance footage. One of the defendant’s family members was on top of Brooks fighting, and the defendant got involved in that fight.
Rayford testified that the defendant tried to get to the family member who was being beaten by Williams, Wise and Townsend. Rayford replied in the negative when asked whether while he was watching this fight he saw anyone with weapons. He did not see the defendant with a knife that night. He did not see the defendant stab anyone. He saw the defendant throw punches and pursue, a little, those people when they were trying to get away from him. However, Rayford said Williams, Wise and Townsend were still trying to come at the defendant. Rayford testified that “G-Nike” Gaines and “Big Baby” Williams were not allowed into Utopia that night because of a management decision based on prior incidents. Rayford was directed to the video surveillance footage. He said that when Brooks was attempting to engage in a confrontation with the defendant, as depicted in the video surveillance footage, Brooks was saying: “I’m going to kill you. I’m going to kill you.” He said he could not really hear the defendant saying anything at that time. Ray-ford said “Twin” Townsend was in the video, wearing a white t-shirt. He said a guy in a black collared shirt on the video was a bar back who worked at Utopia, who was not supposed to be outside at that time. Rayford also saw a Utopia employee, “Ferd,” on the video. Rayford grew up with Ferd and went to school with him. Rayford said that Ferd went inside, got a gun from one the Utopia security guards, and ran behind the defendant. Rayford replied in the negative when asked whether he ever saw the defendant or any of his family members initiate a fight that night.
120Rayford was shown a video of another fight. He said the video footage of the other fight showed “Big Baby” Williams, “Rocky” Wise and “Twin” Townsend hitting one of the defendant’s family members. Rayford said he did not know any of the defendant’s family members prior to September 16, 2007. As for “Big Baby” Williams, “G-Nike” Gaines, “Rocky” Wise and “Twin” Townsend, he said he knew them from coming to the club and from him having problems with them all the time. He did not dislike them as people; *1156 he just did not like their violent attitude toward things. Rayford said he wrote a report for Utopia about the incident. He also spoke to police who were looking for the defendant. Rayford said the police did not want to hear what he had to say about that night. He said essentially the same thing about the District Attorney’s Office.
On cross examination Rayford replied in the negative when asked by the Assistant District Attorney examining him whether he had ever spoken with her or her fellow Assistant District Attorney prosecuting the case with her. Rayford did not know who made the video showing what he believed was one of the defendant’s family members being beaten up. When asked if he could see anyone’s face, he replied that he could see “Big Baby’s” face. He admitted that one could not see the face of the person being beaten. However, he said he knew what happened because he was there.
The defendant testified that on the night of Saturday, September 15, 2007, he played for Tulane University in a football game at the Superdome. His mother, father, two brothers, Jelani and Timothy, his sister, Ebony, her husband, and two nephews and a niece came to the game. He, Timothy and Jelani went to “The Boot” afterward, then went to Utopia where they met his roommate, Ade, and ran into his cousin, Robert. Robert was kind of drunk, and Robert and Larry Brooks ^exchanged words. The defendant said Brooks’ eyes were big, and he looked angry. The defendant told Robert to “chill out”. At some point thereafter the defendant noticed a tall dark-skinned individual with two long braids standing in the defendant’s space. The defendant felt the man was threatening. He told the individual that they did not know their group and their group did not know them, so to just leave it like that. The individual did not respond verbally. He just looked at the defendant with the same expression that Brooks had. The defendant and his family tried to leave Utopia through the blue bar side, but were blocked by a Utopia bouncer, who, the defendant said, was the last witness to testify on behalf of the State— Ferd Edgar. The defendant and his group had to exit through the red bar side. A shot girl and Robert bumped into each other. The defendant said it looked like she did it on purpose. She then started cursing Robert, and he began cursing her. The defendant grabbed Robert. The defendant noticed a large man outside in front of the door, pounding his fist and saying that the defendant and his group were cowards. The defendant tried to stay inside Utopia, but the two bouncers said he could not. The defendant said he was asking the big guy and Brooks, who was also outside at this point, to let them go home, and that his cousin was just drunk, not to listen to him. Meanwhile, Robert, his cousin, was responding to the taunts of those outside, cursing at them and saying they did not scare him.
The defendant said he asked Utopia security to call the police, but they did not; he said they had smirks on their face when he asked. He said he did not want to pull out his cell phone and look down when “Big Baby” Williams was three feet in front of him outside jumping with his fist closed like he was going to rush in the club. The defendant said he recognized Williams, that he knew him from when he | ^worked at the Jazz Emporium for a couple of weekends. The defendant said he kept his distance from Williams when he worked at the Jazz Emporium because Williams was really loud and boisterous. The defendant said that on his second night at the Jazz Emporium a security person pointed out the people that would fight right off the bat, and Williams was pointed out and referred to as “our knock *1157 out king.” The defendant stated that he knew it was going to be a real fight, and that Williams and the others were not just blowing hot air. Jelani Smith left the club, unnoticed by the defendant. Robert left and was walking down the sidewalk with Williams shadowing him. Williams called Robert a “bitch”, called him by his name, and told him to watch his back. Williams then hit Robert in the face and. hit him again, knocking Robert out. The defendant left the club and attempted to reach Robert. He took steps outside and he felt a mob of people pounding and beating on him. He did not recognize who it was. He fell down and crawled from underneath the pile of people. He jumped up and saw his brother Timothy Rockette fighting four or five people. He jumped on the crowd, trying to pull people off of Rockette. He got hit in the head with a bottle by a female, perhaps the woman who had been at the front door of Utopia. He was fighting, trying to get Rockette free, when another bottle was broken over his head. He said that dazed him really badly, and he kind of fell to the ground. He said he was being kicked, and he grabbed a broken bottle by the neck and got up to swing it. He could not see faces. Everybody jumped back. But he said he did not come into contact with anybody. He started running toward Canal Street to get to the car to get home. He said that anytime anybody got in close proximity of him he would stomp, holler, and scream at the top of his lungs that he just wanted to go home. He did not know where his two brothers and his cousin were at that time.
12sThe defendant said that night he was wearing a red shirt; his brother Timothy Rockette was wearing a gray polo shirt; his brother Jelani Smith was wearing a white t-shirt with a green logo across the front and a white jacket; and his cousin Robert was wearing a navy blue shirt. He spotted Smith and Rockette three or four businesses up Bourbon Street. The defendant did not keep going because he did not know where Robert was. He did not use his cell phone to call for help because people were still trying to attack them. He went back toward Brooks because his cousin Robert was behind Brooks. He did not say anything to Brooks at this time. But he said Brooks was in a rage, saying: “You don’t know who the ‘F’ I am, you don’t know who I am,” and “I’m about to kill you; I’m going to kill you.” • The defendant said he was approaching Brooks as Brooks was approaching him. The defendant said he believed he was by himself at that time. He did not see his brother, Timothy Rockette, on the side of him. The defendant went towards Brooks, and Brooks leaned back and kicked him in the chest, causing him to stumble backward. The defendant then saw Rockette jump on Brooks. The defendant saw other people coming, and he knew they needed to get out of there. The defendant got involved in the fight between Brooks and Rockette because he noticed his brother’s back was bleeding. The defendant said it looked like Brooks was stabbing or cutting Rock-ette, although the defendant could not tell what Brooks was stabbing/cutting Rock-ette with. The defendant said he still had the broken bottle in his hand, but he was punching and trying to pull Rockette off. He said he was only swinging with one hand while he was trying to separate his brother and Brooks. The defendant testified that he eventually got Rockette free, and that they took off running. Then-cousin Robert had passed them up a little bit, and Jelani Smith was farther up Bourbon Street toward Canal Street. He said they 124were still being chased by at least seven people. Asked why he then did not get in the car and go to the police station in the French Quarter, the defendant said he did not know where it was. He did not *1158 telephone the police because he did not know anyone was badly hurt that night.
After the fighting, the defendant and his two brothers went to the Tulane University training room. They dropped Robert on some street corner. The defendant admitted he lied to trainer Andy Massey when he told him he cut his wrist in a fall. The defendant said his brothers could not be treated by Tulane personnel. He described Rockette’s wounds as not that deep, although he was bleeding pretty badly. Once they stopped the bleeding they just used some cleanser and peroxide and bandaged him. Asked why they did not take Rockette to a hospital, the defendant said that, for one reason, Rockette did not have insurance. The defendant used Band-Aids to bandage a head wound that was not a bad cut. The defendant did not know the police were looking for him. He did not know the video surveillance footage was being played on the news. He said that between working out, classes, practice, and homework he often did not watch television. The first time he knew he was in trouble was when he got arrested. The defendant said he consented to a search of his apartment because he had nothing to hide. The defendant said he did not put the knife inside the television box he was using as a nightstand. The packing materials were still inside the box, and he said he never looked inside of it after he began using it as a nightstand.
The defendant was shown the pocket knife police recovered from his apartment. When asked whether he had ever seen it before that day in court, the defendant replied in the negative. The defendant did not know Detective Sergeant Monie, who recovered the knife, before the incident. The defendant said he had aj^very good relationship with the police before the incident and that he had never gotten into any trouble. The defendant testified that after his arrest he tried to tell the officers what had happened, but they kept saying: “no, you did this. You did this.” The defendant replied in the affirmative when asked whether he ever told police that his brothers and his cousin had been there that night. The defendant stated that when he was told at the time of his arrest that five people were hurt really badly, that three were in the hospital and one was a woman, he was in shock. The defendant said it was not true that he stabbed five people that night. Asked how he knew he did not stab five people when he admitted that he was swinging a bottle, the defendant replied that it was because people backed away from him the minute he picked up the bottle and screamed. The defendant denied having a knife that night; he denied pulling a knife out of his pocket; and he denied having a knife in his pocket. The defendant was asked what he would have done differently if he knew then what he knows now. He replied that he would not have left his apartment that night, or that they would have picked a different place to go. Or, assuming the incident happened, he would have run straight to the police.
The defendant testified on cross examination that he was five feet nine inches tall and tried to keep his weight at two hundred pounds. He was a running back and return specialist on the Tulane University football team, and he could run a forty-yard dash in approximately four and one half seconds. The defendant said he was not really sure what he was signing when he signed the consent to search form for his apartment for Detective Sergeant Mo-nie. He said Detective Sergeant Monie read papers to him, but he was not sure what he read. He said the television box in which the knife was found sat next to his bed for over a year, and that he never looked in the box. The defendant remembered telling police officers, when |gfithey *1159 came to search his apartment and arrest him, that he was sorry. The defendant replied in the negative when asked whether by that remark he meant he was sorry for hurting Keith Townsend, Larry Brooks, Carlton Williams, Damion Wise and Delissa Ford. Asked what he was sorry for, the defendant said for even being involved in anything like that. When the defendant was asked whether he was sorry about Keith Townsend’s state today, he said he did not even know who Keith Townsend was until the trial.
The defendant was asked about dropping off his cousin Robert a few blocks away from Canal Street after the fighting. He said Robert wanted to be dropped off and that he had someone waiting for him at a hotel. The defendant said he advised Robert against it, but Robert insisted. The defendant was shown the surveillance video and was asked what he was holding in his hand. He replied: “It’s a bottle.” He said it was in his right hand. The defendant admitted that in the video footage he is seen swinging his right arm at the man on the ground. He replied in the affirmative when asked again whether his right hand was the one he had the bottle in. He said he was using his left hand to separate his brother, meaning Timothy Rockette. The defendant said he picked up the bottle after he was hit over the head with a bottle. Asked whether it was true that whatever was in his hand was making contact with the person on the ground, the defendant replied: “It’s possible.” The prosecutor asked the defendant if it was true that on direct examination he testified that the bottle never struck anybody. The defendant clarified that the bottle never struck anybody at “that first fight,” referring to different segments of the fight and stating that he had been asked about one specific incident.
|270n redirect examination the defendant was asked when it was that he picked up the bottle. He said he did so after he got hit over the head with a bottle. He estimated that he had been in three or four fights that night by the time he picked up the bottle. Defense counsel asked the defendant if he did anything to Keith “Twin” Townsend, Damion “Rocky” Wise, Carlton “Big Baby” Williams or to Delissa Ford, and the defendant replied in the negative.
On recross examination the defendant was asked if he did anything to Larry Brooks, and the defendant replied: “Yes.”
Ashley Barrient testified in rebuttal for the State. She identified a video clip of a fight that her sister took with Ashley’s camera on the night of January 13, 2007. She remembered the night because it was the night of her little sister’s graduation. She was not out on the night of September 16, 2007. Barrient confirmed that the video eventually made its way to Damion Wise’s “MySpace” internet web page. She stated on cross examination that she was in the French Quarter with Damion Wise on the night of January 13, 2007, because she was best friends with Wise’s girlfriend. She confirmed that the video depicted what appeared to be five people jumping on one man who was on the ground. Bar-rient confirmed that this occasion was the first time she had been out with Damion Wise and the others she was with. Bar-rient was asked who a particular person was, and she said it “Big Baby,” meaning Carlton “Big Baby” Williams. She thought another person was “Rocky,” meaning Damion “Rocky” Wise, although she could not say for certain, and ultimately she said she did not know who he was. She said all she knew was that “Big Baby” and “Rocky” fought that night, January 13, 2007. She said the fight occurred that night because the person being beaten in the | gsvideo had grabbed “Twee,” and that *1160 person and his two other friends jumped “Rocky.” That particular part of the incident did not appear in the video.
ERRORS PATENT
A review of the record reveals no patent errors.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error the defendant argues that the trial court erred in denying his motion for post verdict judgment of acquittal, because the State failed to meet its burden of proving that the defendant did not act in self-defense.
A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty. La.C.Cr.P. art. 821(B); State v. Williams, 2004-1377, p. 7 (La.App. 4 Cir. 12/1/04), 891 So.2d 26, 30.
The defendant’s argument is directed solely at whether the evidence reasonably permitted a finding of guilty with respect to the issue of self-defense. The defendant’s trial counsel argued self-defense during closing argument, and the defendant’s motion for post verdict judgment of acquittal was primarily directed to the issue of the State’s failure to prove that the defendant did not act in self-defense. In its charge to the jury, the trial court in the instant case instructed the jury that:
If you find that the defendant has raised the defense that his conduct was justified, the State must prove that the defendant’s conduct was not justified. Remember, the State bears the burden of proving the guilt of the defendant beyond a reasonable doubt.
La. R.S. 14:18 sets forth the defense of justification:
The fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
[[Image here]]
(7) When the offender’s conduct is in defense of persons or property under any of the circumstances described in Articles 19 through 22.
La. R.S. 14:19 states:
A. The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person’s lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this Section shall not apply where the force or violence results in a homicide.
[[Image here]]
C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using force or violence as provided for in this Section and may stand his or her ground and meet force with force.
D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used force or violence in defense of his person or property had a reasonable belief that force or violence was reasonable and apparently necessary to prevent a forcible offense or to prevent the unlawful entry.
La. R.S. 14:22 states:
It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifi *1161 ably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.
La. R.S. 14:21 states:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
lapln a non-homicide situation, the defense of self-defense requires a dual inquiry; an objective inquiry into whether the force used was reasonable under the circumstances; a subjective inquiry into whether the force was apparently necessary. State v. Freeman, 427 So.2d 1161, 1163 (La.1988); State v. Jefferson, 2004-1960, pp. 9-10 (La.App. 4 Cir. 12/21/05), 922 So.2d 577, 587. Under La. R.S. 14:19(A), the force or violence used must be both reasonable “and” apparently necessary to prevent the threatened offense. Therefore, if the force or violence used was unreasonable, the issue of whether that force or violence was apparently necessary to prevent the offense is moot.
In Freeman, the Louisiana Supreme Court noted that there apparently was no Louisiana jurisprudence distinguishing the burdens of persuasion applicable to self-defense in homicide and non-homicide situations. The Court further noted that the burden of persuasion in proving self-defense in a non-homicide situation pursuant to La. R.S. 14:19, which entailed a subjective as well as an objective inquiry, “could arguably be upon the defendant,” since a subjective inquiry was involved.[2] However, the Court in Freeman did not resolve that issue because it found that even assuming the State had the burden of proving beyond a reasonable doubt that the defendant in the non-homicide case had not acted in self-defense when she shot her ex-husband, it had carried its burden of proof.
In State v. Fluker, 618 So.2d 459 (La.App. 4 Cir.1993), this Court stated that the First, Second, Third and Fifth Louisiana Circuit courts of appeal had held |sithat the defendant bears the burden of proving self-defense by a preponderance of the evidence, but that three circuits had simply applied both standards in other cases and found no self-defense. This Court in Fluker noted that this Court declined to resolve the issue in State v. Sparrow, 612 So.2d 191, 197 (La.App. 4 Cir.1992), where this Court noted the language in Freeman, but concluded that even if the State bore the burden of proof, the State carried that burden. The Fluker court thus stated that this circuit had therefore never adopted a position on which party has the burden of proof when a defendant raises a claim of self-defense in a non-homicide case. This Court reasoned that whenever an issue of exculpatory circumstances exists, it should be the State’s burden to disprove such a claim of innocence. Thus, we concluded that the State has the burden of disproving self-defense beyond a reasonable doubt in both homicide and non-homicide cases.
In State v. Wishcer, 2004-0325 (La.App. 4 Cir. 9/22/04), 885 So.2d 602, a simple battery case, the majority recognized its prior decision in Fluker, but adopted the *1162 position that justification/self-defense in a non-homicide case was an affirmative defense that the defendant had the burden of proving by a preponderance of the evidence. The concurring judge disagreed with the determination that a criminal defendant in a non-homicide case should bear the burden of proving self-defense or justification, reasoning that, logically, if the State must disprove a defendant’s assertion of self-defense in a homicide case, the State should also bear that burden in a non-homicide case.
In Jefferson, supra, involving review of the defendant’s conviction for attempted first-degree murder of a police officer, this Court acknowledged the conflict between its decisions in Fluker and Wischer. However, the Court found it | ^unnecessary to resolve that conflict in Jefferson, finding that regardless of whether the defendant or the State had the burden of proof on this issue, the evidence presented, when viewed in light most favorable to the prosecution, was sufficient to prove either that the defendant failed to prove by a preponderance of the evidence that he acted in self-defense or that the State proved beyond a reasonable doubt that the defendant did not act in self-defense.
In State v. Stukes, 2008-1217 (La.App. 4 Cir. 9/9/09), 19 So.3d 1238, writ denied, 2009-2194 (La.4/9/10), 31 So.3d 381, involving two convictions for aggravated battery in a double shooting, this Court acknowledged the conflicts between Fluker and Wischer but, as in Jefferson, found that under either standard there was sufficient evidence for the jury to negate the defendant’s claim of self-defense.
Similarly, in the instant case, whether the State bore the burden (as stated by the trial court in its jury instructions) of proving beyond a reasonable doubt that the defendant did not act in self-defense in stabbing the four victims, or the defendant bore the burden of proving by a preponderance of the evidence that he did act in self-defense, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that the defendant did not act in self-defense.
Damion Wise:
The defendant was convicted of aggravated battery in Count One of his indictment for stabbing Damion “Rocky” Wise in the arm. Wise testified that he saw the defendant jump Wise’s nephew, Carlton “Big Baby” Williams, from behind. Wise went to the aid of Williams. He said the only person he hit was the defendant, and that his participation in the fight lasted no more than three minutes. IssWise was positive the defendant was the person who stabbed him in the arm, although he did not see what the defendant stabbed him with. Wise replied in the negative on direct examination when asked whether he had any weapons on him that night. There was no evidence that Wise had any weapons. Williams testified that Wise came and hit the defendant after the defendant hit Williams under his arm and he could not breathe. Utopia bouncer/security person Ferd Edgar, an admitted friend of Wise, testified that the defendant turned on Wise after Wise came to assist Williams. Lionel Rayford, a security person from another club owned by the same owner that owned Utopia, testified that he saw Wise fighting with the defendant and Keith Townsend, and later saw Wise, Williams and Townsend beating one of the defendant’s family members. Rayford said he knew Wise and the others and that they were known for fighting. Rayford also stated that he saw no one with weapons that night, neither the defendant nor anyone else. The defendant denied stabbing anyone that night, either with a bro *1163 ken bottle or a knife, except possibly Larry Brooks.
Viewing all of the evidence in alight most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant’s stabbing of Wise was not reasonable under the circumstances, either in defense of himself or any other person(s).
Larry Brooks:
The defendant was convicted of attempted manslaughter in Count Two of his indictment for stabbing Larry Brooks. Even assuming Brooks had threatened and fought with the defendant and his family members, and even assuming Brooks was the aggressor, not the defendant, the video clearly shows the defendant and his brother Timothy Rockette coming back directly at Brooks, after the defendant | -^admittedly had walked away. There was defense testimony that the defendant and Rockette were headed back to rescue their cousin, Robert, who, defense witnesses testified, was being beaten beyond where Brooks was situated. Brooks is apparently saying things on the video, and his fiancée Tyereaun Henry is trying to hold him back, pulling on his shirt. Henry testified that she was telling Brooks to come back because the defendant had a knife. She said the defendant turned around to come back, saying “ ‘F’ that,” “ ‘F’ that,” and pulled a knife out of his pocket. Henry saw the knife in the defendant’s hand. The video shows the defendant carrying something in his right hand as he came back. The defendant testified that it was a broken bottle, not a knife. However, Jefferson Parish Sheriffs Office Detective Sergeant Darren Monie testified that the defendant admitted to him that the knife police found in the defendant’s apartment was the one defendant had used that night.
While there was testimony from defense witnesses that Brooks stabbed Timothy Rockette, that allegedly occurred after the defendant and Rockette walked back into the picture toward Brooks. The defendant came back toward Brooks holding a broken bottle or a knife in his hand, with Rockette walking at his side, headed directly toward Brooks. While one or more defense witnesses testified that Brooks was yelling that he was going to kill the defendant and Rockette, there was no evidence Brooks had displayed a weapon at that time. The shirtless Rockette rushed and attacked Brooks at this point, supposedly because, according to defense witnesses, Brooks had kicked the defendant in his chest. The video does not show that. In any case, the defendant was brandishing a weapon, and he and Rock-ette were headed directly for Brooks.
lasThere was disputed testimony as to whether Brooks was armed with a bladed instrument, such as an oyster-shucking knife he used in his work. State witnesses did not see Brooks with a weapon; one or more defense witnesses did. The defendant stated that he attacked Brooks at this point, as depicted in the video, because Brooks was stabbing Rockette. However, even though Rockette displayed some scars to the jury that he claimed resulted from being stabbed by Brooks that night, he testified that he did not seek medical treatment, but merely cleaned and bandaged his wounds. Thus, his wounds, however they were inflicted, were minor. The video shows the defendant pumping his right hand, in which he held either the broken bottle or the knife, down toward Larry Brooks, with Rockette in the fray. It is within the realm of possibility that the defendant himself might have stabbed or cut Rockette. In any case, one cannot tell from the video that Brooks is armed with a bladed instrument. Viewing all the evidence in a light most favorable to the *1164 prosecution, any rational trier of fact could have found beyond a reasonable doubt that Brooks was not armed.
The defendant himself suffered only one laceration to his wrist that was treated at the Tulane University athletic training facility by a Tulane trainer who testified that he saw no other injuries on the defendant. The defendant testified he had two other injuries to his scalp that he treated himself. In contrast, Larry Brooks, who was stabbed seven times, was treated at a hospital for his stab wounds and remained in the hospital recovering for two weeks. There was no evidence that the defendant’s cousin Robert suffered any injuries in his alleged beating. Robert was dropped off by the defendant and his brothers on a downtown New Orleans street immediately after, and blocks from, the fracas. Yet, the defendant | <■ (¡advanced on Larry Brooks with either a broken bottle or a knife, purportedly to rescue Robert, and stabbed Brooks.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant’s stabbing of Larry Brooks was not reasonable under the circumstances, either in defense of himself or in defense of any other person(s).
Carlton Williams:
The defendant was convicted of attempted manslaughter in Count Three of the indictment for stabbing Carlton Williams. Williams, a large man, weighing up to two hundred and sixty pounds, allegedly hit the defendant’s cousin and knocked him out. The defendant jumped on Williams when Williams was fighting the defendant’s drunk cousin, Robert. Williams was fighting the defendant when defendant hit him under his arm. Williams said it felt like someone had kicked him, and he could not breathe. He started to go down, and then Wise came and hit the defendant. Williams testified that he was stabbed ten times and was in the hospital for a week and a couple of days. There was no evidence that Williams had a weapon that night. There was defense testimony that Williams called the defendant’s cousin, Robert, a “B”, told him he should watch his back, and then hit him, knocking him out. Williams said he punched Robert because he thought Robert was going to punch him first. There was no evidence about any injuries sustained by Robert. Also, the defendant and his brothers dropped Robert off in downtown New Orleans immediately after the fracas, with Robert saying he was going to meet a friend at a hotel.
Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the | ^defendant’s stabbing of Carlton Williams was not reasonable under the circumstances, either in defense of himself or any other person(s).
Keith Townsend:
The defendant was convicted of attempted manslaughter in Count Four of the indictment for stabbing Keith Townsend, the person who sustained the most serious stab wounds in the entire incident, including one five to six inches deep. Utopia bouncer/security person Ferd Edgar testified that the defendant stabbed Townsend while Townsend was on the ground, on his back. There was no evidence that Townsend had a weapon at any time that night. Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant’s stabbing of Keith Townsend was not reasonable under the circumstances.
For the foregoing reasons, the trial court properly denied the defendant’s mo *1165 tion for post-verdict judgment of acquittal, given that all the evidence, viewed in a light most favorable to the prosecution, permitted the findings of guilty by the jury.
There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant argued that the trial court’s instruction to the jury, that ten out of twelve of the jurors had to agree reach a verdict in each of the five counts, was unconstitutional. The defendant argues that permitting a jury to reach a verdict of guilty in a felony case, necessarily punishable by imprisonment at hard labor, by a less than unanimous jury is unconstitutional.
IssThe defendant concedes that his trial counsel made no contemporaneous objection to the trial court’s instruction, but submits that if a non-unanimous verdict is a violation of due process, the verdict cannot stand, absence of a contemporaneous objection notwithstanding. The defendant argues that a non-unanimous verdict in a case such as the instant one violates the U.S. Sixth and Fourteenth Amendments.
The Louisiana Supreme Court and this Court have rejected the argument that a non-unanimous verdict in a case such as the instant one, provided for by La.C.Cr.P. art. 782(A), violates the U.S. Fifth, Sixth or Fourteenth Amendments to the U.S. Constitution.
In State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
Bertrand, 2008-2215, p. 8, 6 So.3d at 743.
This Court cited and relied on Bertrand in State v. Barbour, 2009-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, to reject the argument that the trial court had [anerred in denying the defendant’s motion to declare La.C.Cr.P. art. 782(A) unconstitutional as violative of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.
As stated by the Louisiana Supreme Court in Bertrand, under current jurisprudence from the U.S. Supreme Court, non-unanimous twelve-person jury verdicts are constitutional, and La.C.Cr.P. art. 782(A) is constitutional.
Thus, there is no merit to the defendant’s argument in this assignment of error that the trial court’s jury instruction that ten of twelve jurors needed to concur to render a verdict was unconstitutional.
For the foregoing reasons, we affirm the defendant’s convictions and sentences.
AFFIRMED.
TOBIAS, J., Concurs in the Result and Assigns Reasons.

. Officers from the Jefferson Parish Sheriff's Office during a search of the defendant’s apartment found a large silver and black pocket knife and logged it into NOPD Central Evidence and Property Facility. During his testimony, Detective Kesler identified this knife.

. Some three years earlier, in State v. Landry, 381 So.2d 462 (La.1980), the Louisiana Supreme Court (without even questioning whether the burden in a non-homicide case was on the defendant to establish that he acted in self-defense or on the State to prove that the defendant did not act in self-defense), reversed a defendant’s conviction for aggravated assault, finding that he established the affirmative defense of self-defense/justification by a preponderance of the evidence.